## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2009-NMSC-024

Filing Date: May 22, 2009

Docket No. 30,191

STATE OF NEW MEXICO,

       Plaintiff-Appellee,

v.

JOSHUA BARR,

       Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF LUNA COUNTY
Henry R. Quintero, District Judge

Hugh W. Dangler, Chief Public Defender
William A. O'Connell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Max Shepherd, Assistant Attorney General
Santa Fe, NM

for Appellee

## OPINION

**SERNA, Justice.**

**{1}** Pursuant to Rule 12-102(A)(1) NMRA, Joshua Barr (Defendant) appeals his convictions for first degree murder and tampering with evidence, contrary to NMSA 1978, Section 30-2-1(A) (1963, as amended through 1994) and Section 30-22-5(A) (1963, as amended through 2003), in the shooting death of Robert Lustig (Victim). Defendant argues that his confession was involuntary and should have been suppressed and that the introduction of a videotaped statement by Mark Varkevisser at trial was reversible error. We affirm.

1

## I.    FACTS AND PROCEEDINGS BELOW

### A.    Factual Background

{2}    On April 17, 2005, a body wrapped in trashbags and tape was found in a refrigerator near an abandoned house fifteen miles south of Deming. An autopsy revealed that the individual had been killed by a gunshot wound to the head. After investigation, police determined that the body was that of Victim, who had disappeared from the area approximately one year previously.

{3}    An investigation into Victim's background led a group of five law enforcement officers to visit the Columbus Police Department where Victim had worked as an auxiliary police officer. Defendant was also an auxiliary officer with the Columbus Police Department and happened to be present when the officers visited the station looking for information about Victim. Defendant gave the officers a two and a half page handwritten statement summarizing his knowledge of Victim. He wrote that he, Victim, and Varkevisser had all lived together in Victim's home, that Victim had had problems with Varkevisser, that Defendant had been evicted from the shared home, and that Defendant and Varkevisser had subsequently rented another home together. Defendant's statement did not include the dates of when the incidents he described occurred.

{4}    The five officers sat down with Defendant and reviewed his statement in an effort to ascertain a timeline of the end of Victim's life. However, Defendant was unable to provide the officers with the dates that they wanted, explaining that he was "bad with dates." One of the officers testified that Defendant appeared "very nervous" during this interview and was rocking his chair back and forth and sweating profusely. A second officer testified that Defendant was "uneasy" and "nervous," though he did not recall seeing him sweat. The officers concluded the interview and advised Defendant that they might need to speak with him again.

{5}    In the ensuing days, the officers investigated the leads that Defendant had provided in his statement. They learned that Victim's landlord and another friend had gone to Victim's home to communicate with him once he had fallen behind on his rent and had noticed that Victim's computer and CDs were missing. When they checked the records of a pawn shop near Victim's home, the officers learned that Varkevisser had pawned approximately 100 CDs and 25 DVDs at about the time that Victim disappeared. However, the officers were unable to locate Varkevisser at that time.

{6}    Approximately three days after Defendant's initial interview, two of the officers went to the Columbus police station and asked whether Defendant would be willing to come with them to the Deming sheriff's office for another interview. They wanted Defendant to try again to assist them in composing a timeline of the end of Victim's life. One of the officers testified that Defendant was not a suspect at the time; rather, it was Varkevisser who was of

2

most interest. The officers chose to interview Defendant in Deming because there was no appropriate space at the Columbus police station; at the initial interview, there had been people coming in and out of the room and the room was too small for Defendant and all of the officers to comfortably fit. Defendant agreed to come with the officers and accompanied them in their car from Columbus to Deming, about thirty miles.

**{7}** Defendant was interviewed in a room normally used for eating and taking breaks. There were four law enforcement officers in the room with Defendant. He was given his Miranda warnings and signed a waiver of Miranda rights form. One of the officers testified that Defendant was mirandized before the interview began, while Defendant testified that he was mirandized at some point during the interview.

**{8}** The accounts given by the two testifying officers and Defendant differ in some minor respects with regard to what occurred at the interview, but the essential facts are relatively clear.

**{9}** The interview began with a review of the statement that Defendant had provided the officers at the initial interview. The tone at this point was relatively "easygoing," "cooperative," and "smooth."

**{10}** Gradually, the interview grew more intense as the officers began to press Defendant. One of the officers sensed that Defendant was nervous because his hands twitched, he avoided eye contact, and he was evasive. One or more of the officers told Defendant that they felt he was holding something back. One of the officers asked Defendant what should happen to the person who killed Victim, to which Defendant responded that the perpetrator should get the death penalty. Both officers and Defendant testified that this was the first mention of the death penalty. Then one of the officers told Defendant something to the effect of "[t]hat's what you could get." There was some discussion of the penalties for the varying degrees of murder. At about this time, Defendant said "[y]ou son a bitches think I did it." After some further discussion, Defendant asked "[w]hat kind of deal can I get?" or "[w]hat can I get?" The officers told Defendant that they could not offer him a deal; however, they may have offered to speak to the district attorney on his behalf, if he made a statement. Defendant told them that he did not want to get the death penalty because he was afraid of dying. Defendant then confessed to the murder.

**{11}** Defendant told the officers that he and Victim were at Victim's home playing computer games in Victim's bedroom and that he had shot Victim in the back of the head at close range while Victim was facing the screen. He said that he then shot Victim in front of the head "to put him out of his misery."[1] Defendant did not reveal any motive for killing

---

[1] Though Defendant admitted to shooting Victim twice and the autopsy showed that only a single gunshot wound had penetrated Victim's skull, expert testimony was presented that the second shot may have resulted in only a graze wound. Such a wound would have

Victim; he told the officers that he wanted to keep it to himself.

**{12}** Defendant corroborated what the officers knew from the physical evidence about the manner in which Victim's body had been disposed. He said that he had wrapped the body with trashbags and tape and had taken it to the refrigerator near the abandoned house where the body had been discovered.

**{13}** Though Defendant made no mention of Varkevisser's involvement or presence at Victim's home that night, the officers nonetheless wanted to speak with him. They located and interviewed Varkevisser about one week after Defendant's confession and arrest. Varkevisser's entire statement was videotaped. Varkevisser told the officers that, on the night of Victim's death, he was also at Victim's home playing computer games with Victim and Defendant. He corroborated Defendant's version of events and told the officers that Defendant had shot Victim in the back of the head for no apparent reason while Victim was playing a computer game. Varkevisser told the officers that Defendant had threatened him in such a manner that he was forced to help wrap and dispose of Victim's body. He said that he had not reported the murder for fear that he would be charged with accessory.

**{14}** In addition to the substantive information about the night of Victim's murder, Varkevisser's videotaped statement also contained numerous extraneous utterances by both him and the officers that may have been improper if made on the witness stand. For example, the officers prompted Varkevisser to speculate about any possible motive Defendant may have had. Some of the speculation impugned Defendant's character, such as Varkevisser's statements that Defendant "is a drinker" and "has a bad history." The officers asked Varkevisser whether Defendant was "all there." Varkevisser also stated that he was "still scared of [Defendant]." One of the officers responded "I can understand that" and another said "[w]ell, he's in jail."

**{15}** Varkevisser's videotaped statement also included discussion of Defendant's prior bad acts. For example, the officers asked Varkevisser how many burglaries he and Defendant had committed and Varkevisser told the officers that Defendant put a knife or sword to Varkevisser's head sometime after the death of Victim.

**{16}** Finally, there were also statements in the video that may have had the potential to bolster Varkevisser in the eyes of the jury. To that effect, Varkevisser states that he would "even take a lie detector test." The video also shows one of the officers telling Varkevisser that he would tell the district attorney that Varkevisser had cooperated and told the truth and that Varkevisser could tell his parents that he cooperated.

**B.     Proceedings Below**

---

been impossible to detect given the advanced deterioration of Victim's body when it was found.

4

**{17}** At trial, Varkevisser testified on behalf of the State. During cross-examination, defense counsel attempted to impeach Varkevisser with the relatively minor inconsistencies between his in-court testimony and his videotaped statement. Defense counsel confronted Varkevisser with discrepancies having to do with whether Varkevisser saw blood on Victim's head when Victim was shot, the color of clothes that Victim was wearing when he died, what time Varkevisser picked Defendant up to go to Victim's home on the night of the murder, and when Varkevisser first saw the gun that Defendant allegedly wielded that night.

**{18}** On re-direct, the State sought to admit the videotaped statement into evidence under the rule of completeness. Defense counsel offered the following objection:

> I don't think that this is a proper offer . . . . I think you can offer certain portions of the transcript, if you want to rehabilitate [Varkevisser], but you can't offer this video as an exhibit because the jury can go back and play the whole video. And it has stuff on there that has nothing to do with what I cross-examined him on.

The district court admitted the video under the rule of completeness, stating "if you offer part of it, and the other side wants to make sure the jury has the full clear understanding of the entire [statement], they can submit the whole thing." The court allowed the State to play the video, though it did not allow it to go to the jury.

**{19}** At the conclusion of the video, Defendant moved for a mistrial. Defense counsel argued that, in addition to "what [he] had said earlier about it not being proper rehabilitation of a witness," the video also contained "a number of things that were objectionable." Namely, defense counsel argued that the video contained improper speculation about motive, character, and prior bad acts.

**{20}** The State responded that it was defense counsel who first mentioned the transcript on his cross-examination of Varkevisser. The State argued that defense counsel had been attacking the credibility of Varkevisser and that he was "picking and choosing" out of the transcript to do so.

**{21}** The court denied Defendant's motion for a mistrial. It largely agreed with the State's framing of the issue, saying that defense counsel opened the door to the transcript and could not "pick and choose" what it would quote out of a deposition or a statement. The court went on that, if there was anything on the video that was more prejudicial than probative, defense counsel had failed to object with the requisite specificity; defense counsel's general objection to playing the videotape did not suffice.

**{22}** The jury convicted Defendant of first degree murder and tampering with evidence. Defendant moved for a new trial on the basis that the admission of the videotaped statement exceeded the scope of proper rehabilitation, enhanced the credibility of Varkevisser in the eyes of the jury, and put information before the jury that was improper for it to consider.

5

The court denied Defendant's motion. Defendant was sentenced to life plus three years imprisonment.

## II.     DISCUSSION

### A.     Defendant's Confession Was Properly Admitted

**{23}**     Defendant argues that his confession was involuntary and should have been suppressed by the district court because he has only an eighth grade education and because he was intimidated by the discussion of the death penalty during the interrogation.

**{24}**     A reviewing court will examine the "totality of the circumstances to determine as a threshold matter of law whether the State has proved by the preponderance of the evidence that [a] [d]efendant's confession was voluntary." *State v. Lobato*, 2006-NMCA-051, ¶ 9, 139 N.M. 431, 134 P.3d 122. "Voluntariness means freedom from official coercion." *State v. Sanders*, 2000-NMSC-032, ¶ 6, 129 N.M. 728, 13 P.3d 460 (internal quotation marks and citation omitted). A confession is coerced when the Defendant's "will [was] overborne and his capacity for self-determination [was] critically impaired." *Id.* (internal quotation marks and citation omitted). Direct or implied promises extended to a Defendant do not make the ensuing confession per se involuntary; rather, they are merely one factor to be considered in analyzing the totality of the circumstances. *Id.* ¶ 7.

**{25}**     First, defense counsel argues that Defendant's confession was involuntary because he has only an eighth grade education and a history of drifting from job to job. However, involuntariness requires official coercion: "there must be an essential link between coercive activity of the State . . . and a resulting confession by a defendant." *State v. Munoz*, 1998-NMSC-048, ¶ 21, 126 N.M. 535, 972 P.2d 847 (internal quotation marks and citation omitted). However uneducated or unsophisticated Defendant may be, that alone is insufficient to make his confession involuntary without evidence that the officers took advantage of his lack of sophistication and used it to coerce him into making his incriminating statement. *See Lobato*, 2006-NMCA-051, ¶ 9 ("A confession is involuntary only if official coercion has occurred.")

**{26}**     Next, Defendant claims that he confessed to killing Victim only out of fear of death after the prospect of his receiving the death penalty was discussed in the interrogation. Although Defendant's appellate counsel claims that the confession was involuntary because the officers essentially threatened Defendant with the death penalty, Defendant testified at the suppression hearing that he was the one to introduce the prospect of the death penalty during the interrogation.

**{27}**     From Defendant's testimony at the suppression hearing, it seems that his claim that he confessed only out of fear of death essentially collapses into a claim that the confession was involuntary because the officers promised that they would advocate on his behalf with the district attorney about not seeking the death penalty for him. However, this Court has

6

held that the existence of promises or threats extended to a suspect does not make any ensuing confession per se involuntary; rather, it is merely one factor to be considered in analyzing the totality of the circumstances. *See Sanders*, 2000-NMSC-032, ¶¶ 7, 10. Since Defendant points to no more reasons why his confession was involuntary, we cannot conclude that his "will [was] overborne and his capacity for self-determination [was] critically impaired." *Id.* ¶ 6 (internal quotation marks and citation omitted). The district court properly admitted Defendant's confession.

## B.    Admission of Varkevisser's Videotaped Statement Was Harmless Error

**{28}**    Defendant argues that admission of the video of Varkevisser's statement to the police was improper as it introduced speculations and insinuations concerning Defendant's motive, prior bad acts, and character. The State responds that the videotaped statement's admission was proper either as a prior consistent statement or under the rule of completeness.

**{29}**    The admission or exclusion of evidence is within the sound discretion of the district court; that judgment will be set aside only on a showing of abuse of discretion. *State v. Bell*, 90 N.M. 134, 138, 560 P.2d 925, 929 (1977). A trial court abuses its discretion when it exercises its discretion based on a misunderstanding of the law. *State v. Elinski*, 1997-NMCA-117, ¶ 8, 124 N.M. 261, 948 P.2d 1209.

### 1.    The Videotaped Statement Was Not Admissible as a Prior Consistent Statement

**{30}**    In its response to Defendant's motion for new trial, the State claimed that it had moved to admit Varkevisser's videotaped statement under Rule 11-801(D)(1)(b) NMRA. Rule 11-801(D)(1)(b) excludes certain prior consistent statements from the definition of hearsay. It reads:

> [a] statement is not hearsay if . . . [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.

Rule 11-801(D)(1)(b). A prior consistent statement is admissible to counter a charge of recent fabrication, improper influence, or motive only where the prior statement was made before the fabrication or the influence or motive arose. *State v. Casaus*, 1996-NMCA-031, ¶ 11, 121 N.M. 481, 913 P.2d 669; *accord Tome v. United States*, 513 U.S. 150, 156 (1995) (concluding the same under the federal rule); *see also* 1 Kenneth S. Broun et al., *McCormick on Evidence* § 47, at 226 (6th ed. 2006) ("[T]he prior consistent statement is deemed irrelevant to refute the charge unless the consistent statement was made *before* the source of the bias, interest, influence or incapacity originated.").

**{31}**    In the instant case, Varkevisser's videotaped statement was not admissible as a prior

consistent statement because it did not precede any alleged motive he had to lie. Rather, if Varkevisser was motivated to lie to exculpate himself in Victim's death or to secure the district attorney's leniency, his motive arose at the time that the police contacted him with the evidence of Victim's murder and their knowledge of his pawning Victim's CDs and DVDs. The police contacted Varkevisser prior to the time that he made his videotaped statement; police contact was in fact the precipitating event that led him to make his statement. Therefore, Varkevisser's videotaped statement was not a prior consistent statement admissible under Rule 11-801(D)(1)(b).

## 2. The Videotaped Statement Was Not Admissible Under the Rule of Completeness

**{32}** The State also claims that Varkevisser's videotaped statement was admissible under Rule 11-106 NMRA. We disagree. Because defense counsel had not created a misleading or deceptive impression of the videotaped statement and because the State had not shown that the entire video was both relevant and explained or qualified the portions initially referenced by defense counsel, the State's reliance on the rule of completeness is misplaced.

**{33}** Rule 11-106 provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part . . . which ought in fairness to be considered contemporaneously with it." Rule 11-106 is an expression of the common law rule of completeness and is a verbatim iteration of the federal rule. *See* Fed. R. Evid. 106; Rule 11-106; *cf. Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171-72 (1988) (stating that the federal rule is a partial codification of the doctrine of completeness).

**{34}** The primary purpose behind the rule of completeness is to eliminate misleading or deceptive impressions created by creative excerpting. The principle behind the rule of completeness is simply stated by Wigmore: "the whole of a verbal utterance must be taken together." 7 John Henry Wigmore, *Evidence in Trials at Common Law* § 2094, at 604 (Chadbourn rev. 1978) (emphasis omitted). The classic illustration of a violation of the rule of completeness is quoting "there is no God" from the biblical phrase "[t]he fool hath said in his heart, there is no God." *See* 1 Broun, *supra*, § 56, at 283-84, citing Wigmore, *supra*, § 2094. To that end, Rule 11-106 permits "the introduction of recorded statements that place in context other writings admitted into evidence which, viewed alone, may be misleading." *State v. Carr*, 95 N.M. 755, 767, 626 P.2d 292, 304 (Ct. App. 1981), *overruled on other grounds by State v. Olguin*, 118 N.M. 91, 879 P.2d 92 (Ct. App. 1994); *accord Beech Aircraft Corp.*, 488 U.S. at 172 ("[W]hen one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is *ipso facto* relevant and therefore admissible . . . ."); *United States v. Ramos-Caraballo*, 375 F.3d 797, 802 (8th Cir. 2004) (recognizing that the rule is intended to avoid "misleading impressions created by taking matters out of context"); Fed. R. Evid. 106 advisory committee's note (stating that the rule is directed at the "misleading impression created by taking matters out of context").

8

**{35}** Rule 11-106 "does not come into play when a few inconsistencies between out-of-court and in-court statements are revealed through cross-examination; rather, it operates to ensure fairness where a misunderstanding or distortion created by the other party can only be averted by the introduction of the full text of the out-of-court statement." *Ramos-Caraballo*, 375 F.3d at 803 (internal citation and quotation marks omitted); *accord United States v. Awon*, 135 F.3d 96, 101 (1st Cir. 1998) ("The doctrine of completeness does not permit the admission of otherwise inadmissible evidence simply because one party has referred to a portion of such evidence, or because a few inconsistencies between out-of-court and in-court statements are revealed through cross-examination . . . ."), *abrogated by United States v. Piper*, 298 F.3d 47, 57 n.5 (1st Cir. 2002). "The rule of completeness permits nothing more than setting the context and clarifying the answers given on cross-examination; it is not proper to admit all prior consistent statements simply to bolster the credibility of a witness who has been impeached by particulars." *Ramos-Caraballo*, 375 F.3d at 803 (internal citation and quotation marks omitted).

**{36}** Rule 11-106 does not mandate that a whole document automatically becomes competent upon introduction of a portion thereof. *See Carr*, 95 N.M. at 767, 626 P.2d at 304; *see also* 1 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 106.05 (2d ed. 2009) ("[T]here is no right to introduce all portions of a document merely because the opponent has employed some portion of it to impeach a witness."). It is "subject to the qualification that only the other parts of the document which are relevant and throw light upon the parts already admitted become competent upon its introduction." *Carr*, 95 N.M. at 767, 626 P.2d at 304 (internal quotation marks and citation omitted); *see also State v. Case*, 103 N.M. 574, 577, 711 P.2d 19, 22 (Ct. App. 1985) (concluding that the district court properly denied the defendant's request that other portions of a transcript be admitted where there was no showing that the refused portions were relevant), *rev'd on other grounds*, 103 N.M. 501, 502, 709 P.2d 670, 671 (1985). Specifically, to be properly admitted under Rule 11-106, the party invoking the rule must show that the evidence is relevant to the issue in dispute and qualifies or explains the subject matter of the portion of the writing already admitted. *See, e.g.*, *Ramos-Caraballo*, 375 F.3d at 802-03; *United States v. Glover*, 101 F.3d 1183, 1189-90 (7th Cir. 1996); *United States v. Walker*, 652 F.2d 708, 710 (7th Cir. 1981).

**{37}** In the instant case, Varkevisser's videotaped statement was not admissible under Rule 11-106 because: (1) the inconsistencies brought out on cross-examination of Varkevisser did not rise to the level of creating a misleading impression of Varkevisser's videotaped statement and (2) the State did not demonstrate that the entire videotaped statement was relevant and that it was necessary to qualify or explain the portion of the statement brought out on cross-examination.

**{38}** First, by attempting to impeach Varkevisser with the minor inconsistencies between his videotaped statement and his trial testimony, defense counsel did not take portions of the earlier videotaped statement out of context to create a misleading impression about the prior statement. *See Carr*, 95 N.M. at 767, 626 P.2d at 304.

**{39}**    The situation in *Beech Aircraft Corp.* is an edifying example of a party taking a portion of a writing out of context to create a misleading impression.  488 U.S. at 170-71.  *Beech Aircraft Corp.* was a product liability suit arising from the death of a navy flight instructor and her student in an airplane crash.  *Id.* at 156.  At issue was whether the crash was the result of equipment malfunction or pilot error.  *Id.* at 157.  The spouse of the deceased flight instructor, Rainey, had written a letter after the crash explaining why he believed it was the result of equipment malfunction.

**{40}**    Rainey did not testify during the plaintiffs' case in chief but was called by the defense as an adverse witness.  *Id.* at 159.  On direct examination, defense counsel asked Rainey about two statements in his letter that, when considered alone, tended to support the defense theory that the crash was the result of pilot error.  *Id.* at 159-60.  On cross-examination, Rainey's counsel asked Rainey whether he had also concluded in the letter that the most likely cause of the crash was equipment malfunction.  *Id.* at 160.  Before Rainey could answer, the defense objected and further questioning about the letter was disallowed.  *Id.*

**{41}**    The United States Supreme Court concluded that the district court had abused its discretion in not permitting Rainey to provide a more complete picture of his letter to the jury under the rule of completeness.  *Id.* at 170.  It stated:

> [w]e have no doubt that the jury was given a distorted and prejudicial impression of Rainey's letter.  The theory of Rainey's case was that the accident was the result of a power failure, and, read in its entirety, his letter . . . was fully consistent with that theory . . . .  What the jury was told, however, through the defendants' direct examination of Rainey as an adverse witness, was that Rainey had written six months after the accident (1) that his wife had attempted to cancel the flight, partly because her student was tired and emotionally drained, and that "unnecessary pressure" was placed on them to proceed with it; and (2) that she or her student had abruptly initiated a hard right turn when the other aircraft unexpectedly came into view.  It is plausible that a jury would have concluded from this information that Rainey did not believe in his theory of power failure and had developed it only later for purposes of litigation . . . .  Rainey's counsel was unable to counteract this prejudicial impression by presenting additional information about the letter on cross-examination.

*Id.* at 170-71.

**{42}**    The use of Varkevisser's statement in the instant case is plainly distinguishable from that of Rainey's letter in *Beech Aircraft Corp.*  Here, defense counsel asked Varkevisser only whether he remembered telling the police certain details of the killing; the use of Varkevisser's prior statement was not misleading, incomplete, or deceptive such that additional evidence was required to explain or qualify it.  Defense counsel merely used

Varkevisser's prior statement to demonstrate "a few inconsistencies" between it and his in-court testimony. *See Ramos-Caraballo*, 375 F.3d at 803 (internal citation and quotation marks omitted). Because Rule 11-106 is purposed on "ensur[ing] fairness where a misunderstanding or distortion [has been] created by the other party," the State's invocation of the rule was inappropriate. *See id.* (internal citation and quotation marks omitted).

**{43}** Next, even if Rule 11-106 did apply, the videotaped statement was not properly admitted thereunder because the State failed to show that it was relevant and either qualified or explained the portion of the statement relied upon by defense counsel. *See id.* at 802-03; *see also State v. Sanders*, 117 N.M. 452, 458, 872 P.2d 870, 876 (1994).

**{44}** In *Sanders*, the State had cross-examined the defendant about two discrete responses to police questioning that he had made in a prior statement. *Id.* Like the State in the present case, the defendant in *Sanders* sought to have his entire twenty-two page statement to the police admitted under the rule of completeness in an effort to put those two answers in context. *Id.* The district court refused the proffer and this Court affirmed because the defendant had made no showing that the entire statement was relevant to the jury's understanding of the admitted evidence, his two answers to the police. *Id.*

**{45}** In the instant matter, Varkevisser's videotaped statement was improperly admitted under the rule of completeness because the State did not show that the entire videotaped statement was relevant and either qualified or explained the portion of the statement relied upon by defense counsel during cross-examination. Rather, the only argument the State made in advocating for the video's admission was: "it's the complete transcription. Counsel is taking portions of that transcription. We, just under the rule of completeness, would like the jury to see the entire transcript." To have the videotaped statement properly admitted, the State was required to specify which portions were relevant and qualified or explained any inconsistencies that it alleged were taken out of context. Failing such a showing, the videotaped statement was admitted in error.

### 3. Admission of the Videotaped Statement Was Harmless Error

### a. In New Mexico, the Harmless Error Standard for Non-Constitutional Errors is Lower Than the Harmless Error Standard for Constitutional Errors

**{46}** The State maintains that even if the admission of the videotaped statement was error, it was harmless. We agree and take this opportunity to clarify the proper standard for non-constitutional harmless error.

**{47}** Evidence admitted in violation of our rules is grounds for a new trial where the error was not harmless. *See, e.g.*, *State v. McClaugherty*, 2003-NMSC-006, ¶ 32, 133 N.M. 459, 64 P.3d 486. The harmless error rule has its origins in the context of non-constitutional error; it arose as a reaction to an era marked by automatic reversal of cases for any procedural error. 7 Wayne R. LaFave et al., *Criminal Procedure* § 27.6(a), at 99-100 (3d

11

ed. 2007). Because of the prevalence of automatic reversals, there was a "widespread and deep conviction" that appellate courts "tower[ed] above the trials of criminal cases as impregnable citadels of technicality." *Kotteakos v. United States*, 328 U.S. 750, 759 (1946) (internal quotation marks and citation omitted).

**{48}** The harmless error rule was adopted to require appellate courts to affirm lower courts notwithstanding "technical errors, defects, or exceptions which [did] not affect the substantial rights of the parties." 7 LaFave, *supra*, § 27.6(a), at 101 (internal quotation marks and citation omitted); *see also* 28 U.S.C. § 2111 (2000) (based on the original provision); Fed. R. Crim. Pro. 52(a) (same). The purpose of the rule was, and continues to be, to limit reversal to errors which impacted the outcome of the proceeding and "to substitute judgment for automatic application of rules; to preserve review as a check upon arbitrary action and essential unfairness in trials, but at the same time to make the process perform that function without giving [individuals] fairly convicted [a] multiplicity of loopholes . . . ." *Kotteakos*, 328 U.S. at 760. Throughout the first half of the twentieth century, harmless error was applied exclusively in the context of non-constitutional error; constitutional error continued to require automatic reversal. 7 LaFave, *supra*, § 27.6(a), at 101.

**{49}** Then, in the 1960s, with the unprecedented expansion of federal constitutional protections into the criminal process, harmless error analysis was imported into the constitutional context. *Id.* To this end, the Court in *Chapman v. California* held that "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." 386 U.S. 18, 22 (1967).

**{50}** The United States Supreme Court has articulated two constitutional harmless error standards, while recognizing that there is "little, if any, difference" between them. *Id.* at 24. Thus, the harmlessness of a constitutional error is properly analyzed asking whether "there [was] a reasonable possibility that the [error] complained of might have contributed to the conviction," *Fahy v. Connecticut*, 375 U.S. 85, 86-87 (1963), or whether the error was "harmless beyond a reasonable doubt," *Chapman*, 386 U.S. at 24; *see also State v. Walters,* 2007-NMSC-050 ¶¶ 25, 27, 142 N.M. 644, 168 P.3d 1068 (referring to both standards in discussing harmless error analysis); *State v. Johnson*, 2004-NMSC-029, ¶ 9, 136 N.M. 348, 98 P.3d 998 (noting that the constitutional harmless error standard has been variously articulated).

**{51}** Constitutional error implicates our most basic, and most cherished, individual rights; non-constitutional error, while still serious, does not pose the same threat to liberty. Therefore, it is appropriate to review non-constitutional error with a lower standard than that reserved for our most closely held rights. *See, e.g.*, *Kotteakos*, 328 U.S. at 765 (holding that the federal standard for non-constitutional harmless error is whether "one can say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, the judgment was not substantially swayed by the error"); *United States v. Lane*, 474

12

U.S. 438, 460-61 (1986) (Brennan, J., concurring in part and dissenting in part) (recognizing that the federal standard for non-constitutional harmless error is less exacting than that for constitutional error); *see also* 7 LaFave, *supra*, § 27.6(b), at 110 (same).

{52}     In New Mexico, however, the constitutional standard has  seeped into our non-constitutional harmless error case law and it is now common for both types of error to be reviewed under the same "reasonable possibility" standard. *See, e.g.*, *State v. Torres*, 1999-NMSC-101, ¶¶ 51-53, 127 N.M. 20, 976 P.2d 20 (applying the reasonable possibility standard and concluding that the improper admission of HGN evidence was harmless); *Clark v. State*, 112 N.M. 485, 487, 816 P.2d 1107, 1109 (1991) (applying the reasonable possibility standard and concluding that the admission of improper impeachment evidence was harmless).  To add to the confusion, in some instances, our case law makes no mention of the "reasonable possibility" standard and instead applies a long-standing three-part test for determining whether non-constitutional error amounts to harmless error. *See, e.g.*, *State v. Duffy*, 1998-NMSC-014, ¶ 38, 126 N.M. 132, 967 P.2d 807 ("For an error to be deemed harmless, there must be:  (1) substantial evidence to support the conviction without reference to the improperly admitted evidence, (2) such a disproportionate volume of permissible evidence that, in comparison, the amount of improper evidence will appear so minuscule that it could not have contributed to the conviction, and (3) no substantial conflicting evidence to discredit the State's testimony.") (internal quotation marks and citation omitted); *State v. Moore*, 94 N.M. 503, 504, 612 P.2d 1314, 1315 (1980).

{53}     In light of the unsettled nature of our case law in this area, we take this opportunity to re-fortify the boundary between non-constitutional and constitutional error for the purpose of harmless error analysis.  Where the defendant has established a violation of the rights guaranteed by the United States Constitution or the New Mexico Constitution, constitutional error review is appropriate.  In these cases, a reviewing court should only conclude that an error is harmless when there is no reasonable *possibility* it affected the verdict.  In contrast, where a defendant has established a violation of statutory law or court rules, non-constitutional error review is appropriate.  A reviewing court should only conclude that a non-constitutional error is harmless when there is no reasonable *probability* the error affected the verdict. *Cf. State v. Day*, 91 N.M. 570, 573-74, 577 P.2d 878, 881-82 (Ct. App. 1978) (stating that the proper harmless error standard in a case of prosecutorial misconduct was whether there was a reasonable probability that the misconduct contributed to the conviction).

{54}     The reasonableness standards provide elasticity that is responsive to the appropriate level of certainty needed before a reviewing court can pronounce an error harmless.  The standards are necessarily difficult to explicate because they are fluid; they will acquire content through application in each case.  Needless to say, the reasonable possibility standard continues to resemble the reasonable doubt standard while the reasonable probability standard requires a greater degree of likelihood that a particular error affected a verdict.  In other words, the universe of harmless error is larger in the context of non-constitutional error than it is in the realm of constitutional error.  To that end, non-

constitutional error is reversible only if the reviewing court is able to say, in the context of the specific evidence presented at trial, that it is reasonably probable that the jury's verdict would have been different but for the error.

**{55}** To determine whether an error meets the requisite standard of harmlessness, a number of different factors come into play. In this regard, the three-part inquiry noted above provides a useful framework for determining not only whether non-constitutional error is harmless, but also for assessing the impact of constitutional error. Though the three elements have previously been characterized as a test, they are more properly described as three factors to be considered. No one factor is determinative; rather, they are considered in conjunction with one another. All three factors will provide a reviewing court with a reliable basis for determining whether an error is harmless.

**{56}** We therefore sanction the use of the following three-part inquiry for determining whether there is a reasonable possibility or reasonable probability that an error, constitutional or non-constitutional, contributed to a verdict. The factors are whether there is: (1) substantial evidence to support the conviction without reference to the improperly admitted evidence; (2) such a disproportionate volume of permissible evidence that, in comparison, the amount of improper evidence will appear minuscule;[2] and (3) no substantial conflicting evidence to discredit the State's testimony. *See, e.g.*, *McClaugherty*, 2003-NMSC-006, ¶ 32. Application of these factors will allow the reviewing court to determine whether there is a reasonable possibility that a constitutional error affected the verdict or whether there is a reasonable probability that a non-constitutional error affected the verdict.

**{57}** Finally, we emphasize that, when assessing the harmfulness of error, it is not the role of the appellate court to reweigh the evidence against a defendant:

> The inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury trial guarantee.

*Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993); *accord State v. Martinez*, 2008-NMSC-060, ¶ 44, 145 N.M. 220, 195 P.3d 1232; *Johnson*, 2004-NMSC-029, ¶ 43. The harmless error analysis does not center on whether, in spite of the error, the right result was reached. Rather, the focus is on whether the verdict was impacted by the error.

---

[2] Having clarified the appropriate standards for constitutional and non-constitutional error, we eliminate the second clause of this factor which existed in previous iterations of the three-part inquiry to so reflect.

**b. There is No Reasonable Probability That Admission of Varkevisser's Videotaped Statement Affected the Verdict Against Defendant**

**{58}**     Defendant established that Varkevisser's videotaped statement was admitted in violation of the New Mexico Rules of Evidence and, therefore, we review the error under the non-constitutional standard. First, there was substantial evidence to support Defendant's convictions without reference to the videotaped statement. Defendant's confession provided strong evidence against him. *See State v. Alvarez-Lopez*, 2004-NMSC-030, ¶ 34, 136 N.M. 309, 98 P.3d 699 ("Confessions have profound impact on the jury . . . .") (internal quotation marks and citation omitted). Further, Defendant's confession was corroborated both by Varkevisser's testimony and the physical evidence.

**{59}**     Second, there was indeed such a disproportionate volume of permissible evidence that the improper evidence was minuscule in comparison. The improperly admitted evidence amounted to seventy minutes of slow, winding dialogue punctuated by long periods of silence. It contained mostly irrelevant speculation which had no direct connection to Victim's murder. When compared to the volume of permissible evidence—Defendant's confession, Varkevisser's corroborative in-court testimony, and the corroborative physical evidence—the impact of the videotaped statement was inconsequential.

**{60}**     The third factor is whether there was no substantial conflicting evidence to discredit the improperly admitted statement. Because Defendant presented evidence which challenged the extraneous discussion in the video in the form of four character witnesses who testified that he was a "peaceful, nonviolent, law abiding citizen," the jury may have used the improperly admitted video to resolve the conflict in character evidence against Defendant. Thus, this factor weighs against harmlessness.

**{61}**     Finally, we note that, overall, this was not a case where both sides presented significant conflicting evidence. In addition to his four character witnesses, Defendant testified on his own behalf, stating that he had nothing to do with Victim's death and that his confession was involuntary. On the other hand, the State presented overwhelming evidence of guilt, including Defendant's confession, Varkevisser's corroborative eye-witness account, and the corroborative physical evidence. In light of the overwhelming evidence of guilt, the impact of the videotaped statement, which was largely cumulative of Varkevisser's in-court testimony and Defendant's confession, was negligible. On balance, the lack of significant conflicting evidence overall weighs in favor of the harmlessness of the admission of the video.

**{62}**     Because there was substantial evidence to support Defendant's convictions without reference to the videotaped statement, such a disproportionate volume of permissible evidence that the improper evidence was minuscule in comparison, and a lack of significant conflicting evidence overall, we conclude that there was no reasonable probability that admission of Varkevisser's videotaped statement contributed to Defendant's conviction.

**{63}** In the words of the United States Supreme Court, "[a] defendant is entitled to a fair trial but not a perfect one." *See Lutwak v. United States*, 344 U.S. 604, 619 (1953). Admission of the videotaped statement was error, but we conclude that it was harmless. Defendant's convictions are affirmed.

## III. CONCLUSION

**{64}** For all of the foregoing reasons, we affirm.

**{65}** **IT IS SO ORDERED.**

 

 

**PATRICIO M. SERNA, Justice**

**WE CONCUR:**

 

**EDWARD L. CHÁVEZ, Chief Justice**

 

**PETRA JIMENEZ MAES, Justice**

 

**RICHARD C. BOSSON, Justice**

 

**CHARLES W. DANIELS, Justice**

**Topic Index for *State v. Barr*, No. 30,191**

| **AE** | **Appeal and Error** |
|---|---|
| AE-AG | Appeal and Error, General |
| AE-HE | Harmless Error |
| AE-SR | Standard of Review |

| **CT** | **Constitutional Law** |
|---|---|
| CT-CF | Confession |
| CT-SU | Suppression of Evidence |

| **CA** | **Criminal Procedure** |
|---|---|
| CA-MR | Motion to Suppress |

| **EV** | **Evidence** |
|---|---|

EV-AE          Admissibility of Evidence
EV-RU          Rule of Completeness