This decision was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court and does not include the filing date.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO**,

Plaintiff-Appellee,

**v.**                                                    **NO. 31,585**

**ELIAS CHAVEZ**,

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF VALENCIA COUNTY**
**William A. Sanchez, District Judge**

Hugh W. Dangler, Chief Public Defender
J.K. Theodosia Johnson, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Nicole Beder, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**BOSSON, Justice.**

Following a bench trial, Defendant Elias Chavez was convicted of two counts of murder in the first degree, NMSA 1978, § 30-2-1(A) (1994), one count of aggravated battery, NMSA 1978, § 30-3-5 (1969), one count of abuse of a child, NMSA 1978, § 30-6-1 (1973) (amended 2009), and one count of tampering with evidence, NMSA 1978, § 30-22-5 (1963) (amended 2003). Defendant appeals his convictions on grounds that (1) his speedy trial rights were violated, (2) aggravated stalking was an improper predicate felony for felony murder, and (3) the admission of expert testimony from a pathologist violated the Confrontation Clause. We review Defendant's appeal pursuant to Article VI, Section 2 of the New Mexico Constitution and Rule 12-102(A)(1) NMRA. *See State v. Trujillo*, 2002-NMSC-005, ¶ 8, 131 N.M. 709, 42 P.3d 814 ("Our mandatory appellate jurisdiction is constitutional and is limited to appeals from a judgment of the district court imposing a sentence of death or life imprisonment." (internal quotation marks and citation omitted)).

**BACKGROUND**

Defendant has an extensive history of spousal abuse. Given his violent behavior, courts have entered numerous restraining orders prohibiting Defendant from having any contact with his ex-wife Elaine Artiaga. However, Defendant

frequently ignored court orders and incidents of domestic violence continued for over a decade.

On the night of April 2, 2003, Defendant entered the Artiaga family home armed with a knife. Defendant had apparently planned on confronting Elaine about an upcoming child custody hearing. Once inside, Defendant attacked Elaine as she lay in bed, stabbing her in the head. When her father, Paul Artiaga, and her brother, Jerome Artiaga, responded to Elaine's screams, Defendant attacked them. Defendant repeatedly stabbed Paul and Jerome Artiaga, killing them both. Defendant was subject to a two-year order of protection at the time. Defendant was prosecuted for these murders along with other offenses.

**Defendant was Brought to Trial in a Timely Manner**

Defendant contends his rights to a speedy trial under the Sixth Amendment to the United States Constitution were violated because the Grand Jury issued its indictment on April 10, 2003, and Defendant's criminal trial did not commence until October 28, 2008.

"We apply the speedy trial analysis established in [*Barker v. Wingo*, 407 U.S. 514 (1972)] and subsequent cases in the federal courts." *State v. Maddox*, 2008-NMSC-062, ¶ 6, 145 N.M. 242, 195 P.3d 1254. In *Barker*, the United States

Supreme Court created "a balancing test, in which the conduct of both the prosecution and the defendant are weighed." 407 U.S. at 530. The Court identified four factors: (1) the length of delay, (2) the reasons for the delay, (3) the defendant's assertion of his right, and (4) the actual prejudice to the defendant that, on balance, determines whether a defendant's right to a speedy trial has been violated. *Id.*; *see also Zurla v. State*, 109 N.M. 640, 642, 789 P.2d 588, 590 (1990) (adopting the *Barker* balancing test). A district court weighing these factors must necessarily make certain factual determinations and legal conclusions. When reviewing a district court's denial of a motion to dismiss on speedy trial grounds, we give deference to the court's factual findings. *Maddox*, 2008-NMSC-062, ¶ 8; *State v. Urban*, 2004-NMSC-007, ¶ 11, 135 N.M. 279, 87 P.3d 1061. Weighing and balancing the *Barker* factors is a legal determination that we review de novo. *Maddox*, 2008-NMSC-062, ¶ 8; *Urban*, 2004-NMSC-007,¶ 11.

While the over five-year delay in this case is sufficient to trigger an inquiry by this Court, the remaining *Barker* factors make clear that Defendant's rights to a timely trial were not violated. *Maddox*, 2008-NMSC-062, ¶ 9 ("[A] minimum of nine months delay is necessary to trigger further inquiry into the claim of a violation of the right to speedy trial in simple cases, twelve months in cases of intermediate

complexity, and fifteen months in complex cases." (internal quotation marks and citation omitted)). The reason for the delay here is simple. Almost all of the time Defendant spent in pretrial custody stems from his competency proceedings, which Defendant initiated. Competency proceedings began on January 28, 2004, and were not resolved until this Court issued its mandate on December 20, 2007, a period of almost four years. As we have previously noted, the "period of delay resulting from examination of [the] defendant's competence should be excluded from speedy trial computation." *State v. Mendoza*, 108 N.M. 446, 452, 774 P.2d 440, 446 (1989) (citing *ABA Standards for Criminal Justice* § 12-2.3(a) (2d ed. 1980)). Following our mandate, Defendant was brought to trial within ten months. A ten-month delay in a relatively complicated case involving two counts of first-degree murder hardly merits much scrutiny from this Court for speedy trial purposes.

Defendant has also failed to identify any prejudice. *See Maddox*, 2008-NMSC-062, ¶ 32 ("With respect to a showing of prejudice, we have held that '[a]lthough the State bears the ultimate burden of persuasion, Defendant does bear the burden of production on this issue, and his failure to do so greatly reduces the State's burden.'" (quoting *Urban*, 2004-NMSC-007, ¶ 18)). While Defendant claims to have suffered anxiety and concern over the outcome of his case, he has not set

forth any cognizable facts to support this allegation. Moreover, while we have stated that an impaired defense is the *most serious* form of prejudice associated with an untimely prosecution, Defendant has not shown that his ability to defend himself at trial suffered because of his pretrial confinement. *See id.* We therefore reject Defendant's speedy trial claim as lacking merit.[1]

**Aggravated Stalking Properly Served as the Predicate Felony for Felony Murder**

Defendant next argues that aggravated stalking cannot serve as the predicate felony for felony murder because the crime is neither inherently dangerous nor was it committed under circumstances that were inherently dangerous to human life.

In *State v. Harrison*, we held that "in a felony murder charge, involving a collateral lesser-degree felony, that felony must be inherently dangerous or committed under circumstances that are inherently dangerous." 90 N.M. 439, 442, 564 P.2d 1321, 1324 (1977). In making this determination, "both the nature of the

---

[1]To the extent Defendant's reply brief asserts a violation of Rule 5-604 NMRA, or "the six-month rule," that argument is not properly before the Court, since it was neither part of Defendant's brief in chief, nor was it directed to an argument raised by the State in its answer brief. *See Mitchell-Carr v. McLendon*, 1999-NMSC-025, ¶ 29, 127 N.M. 282, 980 P.2d 65 ("[W]e do not address issues raised for the first time in a reply brief [unless it is] directed only to new arguments or authorities presented in the answer brief." (internal quotation marks and citations omitted)).

felony and the circumstances surrounding its commission may be considered." *Id.* This is a factual matter left to the jury, subject to appellate review under a sufficiency of the evidence standard. *Id.*; *State v. Mora*, 1997-NMSC-060, ¶¶ 26-27, 124 N.M. 346, 950 P.2d 789, *abrogated on other grounds as recognized by Kersey v. Hatch*, 2010-NMSC-020, ¶ 17, 148 N.M. 381, 237 P.3d 683.

Aggravated stalking is defined by statute to include any "stalking perpetrated by a person: (1) who knowingly violates a permanent or temporary order of protection issued by a court . . .; [or] (3) when the person is in possession of a deadly weapon." NMSA 1978, § 30-3A-3.1(A)(1), (3) (1997). The evidence produced at trial shows that when Defendant committed the crime of stalking he possessed a deadly weapon—a nine- to ten-inch blade attached to brass knuckles—and violated a court issued protection order.

The circumstances under which Defendant committed aggravated stalking undoubtedly created an inherent danger to human life. At trial, the jury heard evidence of Defendant's ten-year history of violence directed towards his ex-wife. To cite several examples, Defendant severely beat Elaine while she was pregnant, hit her with a closed fist, kicked her in the face, choked her, slammed her head into the side of a truck, and "bust[ed]" her nose with a remote control. Defendant was

subject to protection orders when many of these incidents occurred.

Defendant constantly threatened Elaine and various members of her family with violence. Only one day before the attack, Defendant told the Artiaga's next-door neighbor that he was "going to kill all of you." The record also contains evidence that Defendant was an avid knife collector and was quite skilled at knife throwing. Defendant even boasted that he learned to throw knifes in order "[t]o sever arteries, to know where all the organs were in the body."

Based on this evidence, a rational jury could have easily concluded that Defendant committed the crime of aggravated stalking under circumstances that were inherently dangerous to human life. For that reason, we need not consider Defendant's alternative position that aggravated stalking is not inherently dangerous without regard to the underlying circumstances of the crime.

**The Testimony of the Pathologist had No Reasonable Possibility of Affecting the Verdict**

At trial, the State proffered the expert testimony of Dr. Rebecca Irvine, a pathologist, regarding the autopsies of Paul and Jerome Artiaga. Dr. Irvine supervised the autopsy of Jerome Artiaga, but she did not take part in the autopsy of Paul Artiaga. Dr. Irvine testified about the autopsy results of both decedents, including offering her opinion as to cause and manner of death. To supplement Dr.

8

Irvine's testimony, the state admitted into evidence portions of Paul Artiaga's autopsy report. This included sketches of knife wounds made by the non-testifying pathologist who participated in Paul Artiaga's autopsy, along with photographs of the body.

Defendant challenges the admission of Dr. Irvine's testimony concerning Paul Artiaga's autopsy. Defendant also challenges the portions of Paul Artiaga's autopsy report that were received into evidence. Defendant claims that the admission of this evidence violated his right to confront witnesses under the Sixth Amendment to the United States Constitution.

Under the Confrontation Clause, "testimonial hearsay is barred . . . unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination." *State v. Aragon*, 2010-NMSC-008, ¶ 6, 147 N.M. 474, 225 P.3d 1280. If evidence is not "testimonial," it does not present a Confrontation Clause issue because "only testimonial statements cause the declarant to be a witness within the meaning of the Confrontation Clause." *Id.* (internal quotation marks and citation omitted).

In *Melendez-Diaz v. Massachusetts*, the United States Supreme Court held that the admission of certificates prepared and sworn to by analysts at a state crime

laboratory, identifying a substance as cocaine, were "testimonial" and triggered the procedural safeguards of the Confrontation Clause.  557 U.S. __, 129 S. Ct. 2527, 2531-32  (2009).  We have subsequently applied the holding of *Melendez-Diaz* to the admission of a laboratory report showing blood alcohol content (BAC) results from a gas chromatograph machine.  *See State v. Bullcoming*, 2010-NMSC-007, ¶ 1, 147 N.M. 487, 226 P.3d 1, *cert. granted*, __ U.S. __ [No. 09-10876, 2010 WL 2008002, at *1 (N.M. Sept. 28, 2010)].  We determined that the laboratory BAC report, "like the certificates in *Melendez-Diaz*, are 'formalized testimonial materials' in that they were made 'for the purpose of establishing or proving some fact.'" *Bullcoming*, 2010-NMSC-007, ¶ 18 (quoting *Melendez-Diaz*, 557 U.S. at __, 129 S. Ct. at 2532).  The unsworn laboratory BAC report "was 'functionally identical to live, in-court testimony, doing precisely what a witness does on direct examination.'" *Id.* (quoting *Melendez-Diaz*, 557 U.S. at __, 129 S. Ct. at 2532).

We, nevertheless, held in *Bullcoming* that the admission of the laboratory BAC report did not violate the Sixth Amendment.  *Id.* ¶ 19.  We reasoned that the analyst who prepared the report was a "mere scrivener" and defendant's "true accuser" was the gas chromatograph machine itself.  *Id.* (internal quotation marks omitted).  Unlike *Melendez-Diaz*, where the laboratory certificates were introduced

without the benefit of live, in-court testimony, the state presented testimony from a forensic analyst who was qualified as a gas chromatograph machine expert. *Id.* ¶ 20. The witness was available to be cross-examined "about whether the operation of the . . . machine required specialized skill that the operator did not possess, involved risks of operation that might influence the test results, and required the exercise of judgment or discretion, either in the performance of the test or the interpretation of the results." *Id.* The United States Supreme Court has recently granted Bullcoming's petition for writ of certiorari, and the case remains pending. *See Bullcoming v. N. M.*, __ U.S. __, __ S. Ct. __, 177 L. Ed. 2d 1152 (Sept. 28, 2010).

We issued *Aragon*, 2010-NMSC-008, on the same day we issued *Bullcoming*. In *Aragon*, the police recovered two plastic bags containing unknown substances from a crime scene. 2010-NMSC-008, ¶ 3. The two bags were analyzed by different forensic chemists at the same crime laboratory. *Id.* ¶ 4. Each forensic chemist prepared a separate report regarding the contents of the two bags. *Id.* At trial, the state offered testimony from only one of the forensic chemists who testified to the report he had produced. *Id.* He also testified to the findings of the report produced by the non-testifying chemist, of which he had no personal knowledge. *Id.* Both reports were admitted into evidence. *Id.* ¶ 4.

On appeal, we held that the non-testifying forensic chemist's report and the "testimony about her report were not admissible," absent the opportunity to conduct meaningful cross-examination. *Id.* ¶ 19. To determine whether the defendant had a meaningful opportunity for cross-examination, we focused on whether the testimony of the forensic chemist "was an expression of his own opinion or whether he was merely parroting [the non-testifying forensic chemist's] opinion." *Id.* ¶ 26. We concluded that the testifying expert had not "formed an independent conclusion from the underlying facts or data, but [was] merely restat[ing] the hearsay opinion of a non-testifying expert." *Id.* ¶ 32.

At the same time, we suggested that the admission of either the forensic chemist's testimony or the report might have been proper under certain circumstances. *Id.* ¶ 33. Had the testifying forensic chemist "unequivocally" stated that the contents of the report were his opinion, and had the report contained the "types of facts or data reasonably relied upon by chemical forensic experts in forming opinions," a Confrontation Clause violation may not have occurred. *Id.*

Defendant cites two cases, one from the Missouri Court of Appeals and one from the North Carolina Supreme Court, for the proposition that the admission of such evidence violates the Confrontation Clause. *See State v. Davidson*, 242 S.W.3d

409, 417 (Mo. Ct. App. 2007) ("When an autopsy report is prepared for purposes of criminal prosecution, as this one was, the report is testimonial. The court may not admit the report without the testimony of its preparer unless he or she is unavailable and the defendant had a prior opportunity for cross-examination. Those requirements were not met here. Admission of the report and another medical examiner's testimony in lieu of the testimony of the medical examiner who prepared the report violated the defendant's Confrontation Clause rights." (citations omitted)); *State v. Locklear*, 681 S.E.2d 293, 305 (N.C. 2009) ("Here, the State sought to introduce evidence of forensic analyses performed by a forensic pathologist and a forensic dentist who did not testify. The State failed to show that either witness was unavailable to testify or that the defendant had been given a prior opportunity to cross-examine them. The admission of such evidence violated defendant's constitutional right to confront the witnesses against him . . . .").

We have not yet applied the holdings of *Melendez-Diaz*, *Bullcoming*, and *Aragon* to the admission of a pathologist's opinion based on an autopsy report prepared by a non-testifying pathologist. Nor have we have determined whether the autopsy report itself may be admitted into evidence under Rule 11-703 NMRA. We are aware that the California Supreme Court has recently granted a petition for

13

review on an related legal question. *See People v. Dungo*, 220 P.3d 240, 240 (Cal. 2009) ("Was defendant denied his right of confrontation under the Sixth Amendment when one forensic pathologist testified to the manner and cause of death in a murder case based upon an autopsy report prepared by another pathologist?").

These are novel issues of federal constitutional law that will require thoughtful analysis in an appropriate case. The case before us, however, is not such a vehicle. The record on appeal makes clear that evidence relating to Paul Artiaga's autopsy had no reasonable possibility of affecting the verdict. *See Aragon*, 2010-NMSC-008, ¶ 35 ("'A reviewing court should only conclude that a constitutional error is harmless when there is no reasonable possibility it affected the verdict." (alterations, internal quotation marks, and citation omitted)). Accordingly, we can assume arguendo that evidence from Paul Artiaga's autopsy report should not have been admitted into evidence and the pathologist should not have been allowed to offer an opinion about the cause of death. Assuming all that to be the case, any error was harmless.

Reviewing courts consider three factors when determining whether an error is harmless: "[W]hether there is: (1) substantial evidence to support the conviction

14

without reference to the improperly admitted evidence; (2) such a disproportionate volume of permissible evidence that, in comparison, the amount of improper evidence will appear minuscule; and (3) no substantial conflicting evidence to discredit the State's testimony." *State v. Barr*, 2009-NMSC-024, ¶ 56, 146 N.M. 301, 210 P.3d 198 (footnote omitted). No one factor is determinative; rather, they are considered in conjunction with one another. *Id.* ¶ 55.

> "[W]hen assessing the harmfulness of error, it is not the role of the appellate court to reweigh the evidence against a defendant[.]" [*Barr*, 2009-NMSC-024, ¶ 57.] Therefore, "[t]he harmless error analysis does not center on whether, in spite of the error, the right result was reached. Rather, the focus is on whether the verdict was impacted by the error." *Id.* "Weighing these factors, a court must decide if it can conclude with the requisite level of certainty that an error did not contribute to the jury's verdict." *State v. Macias*, 2009-NMSC-028, ¶ 39, 146 N.M. 378, 210 P.3d 804.

*Aragon*, 2010-NMSC-008, ¶ 35.

Dr. Irvine testified that the cause of Paul Artiaga's death was stabbing. Without Dr. Irvine's testimony, however, substantial evidence in the record demonstrates that Defendant caused Paul Artiaga's death. Multiple witnesses testified concerning the attack on the Artiaga family. For example, Gabriel Artiaga testified that he watched Defendant repeatedly stab Paul Artiaga. Brandy Chavez, the daughter of Defendant and Elaine, testified that before being apprehended by the

police, Defendant admitted to stabbing Paul and Jerome Artiaga.

The State also introduced testimony from first responders who treated Paul and Jerome Artiaga on the night of their death. One witness, Michael Ortega, from the Los Lunas Fire Department, explained that he arrived at the scene and found Paul Artiaga lying face down in a pool of blood, barely breathing, with a "sucking" stab wound in his chest. Mr. Ortega explained that because Paul Artiaga's heart rate was steadily declining, "we terminated our care with him and moved on to more viable patients."

Nothing in the record, substantial or otherwise, discredits the State's evidence that Paul Artiaga died from his knife wounds. Not only did the State present voluminous evidence to prove that Defendant stabbed Paul Artiaga, but the cause and manner of his death were never contested. At trial, Defendant did not suggest that Paul Artiaga died from something other than a stab wound. Nor did Defendant suggest that he did not stab Paul Artiaga. Instead, Defendant acknowledged that he killed both Paul and Jerome Artiaga, but claimed that he was not capable of forming the mental state for murder due to a traumatic brain injury. Therefore, Paul Artiaga's cause of death—the very reason the autopsy report and expert opinion are now being challenged—was never in doubt at trial. Because the admission of

16

portions of Paul Artiaga's autopsy report and Dr. Irvine's testimony about the report were constitutionally harmless, Defendant's Confrontation Clause challenge fails.

We affirm Defendant's convictions.

**IT IS SO ORDERED**.

                                                                
**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

**CHARLES W. DANIELS, Chief Justice**

**PATRICIO M. SERNA, Justice**

**PETRA JIMENEZ MAES, Justice**

**EDWARD L. CHÁVEZ, Justice**