This decision was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court and does not include the filing date.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

NO. 30,022

v.

**NORMAN TYRELL CATES,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF HARDING COUNTY**

Kevin R. Sweazea, District Judge

Hugh W. Dangler, Chief Public Defender
Karl Erich Martell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Joel Jacobsen, Assistant Attorney General
Santa Fe, NM

for Appellee

# DECISION

**SERNA, Justice.**

**{1}** Pursuant to Rule 12-102(A)(1) NMRA, Norman Tyrell Cates (Defendant) is before this Court on direct appeal from his conviction for first degree murder. He raises three issues on appeal: (1) whether his statement to Undersheriff Trubert Flowers should have been admitted; (2) whether a new trial should have been granted because a juror failed to disclose facts demonstrating bias; and (3) whether the mention of the phrase "serial killer" during trial warranted a mistrial. We agree that the district court erred when it admitted Defendant's statements to Undersheriff Flowers. However, given the substance of Defendant's statement and the other evidence presented at trial, we hold that the error was harmless and affirm Defendant's first degree murder conviction. We also affirm the district court's denials of Defendant's motions for a new trial and a mistrial.

## I.    FACTUAL BACKGROUND AND PROCEEDINGS BELOW

**{2}** On the night of December 19, 2004, Defendant and his cousin, along with three friends, went to a dance in Roy, New Mexico. At about 9:30 p.m., the group left the dance and went to an abandoned trailer owned by Defendant's parents and smoked marijuana. The group then returned to the dance for a short period of time, after which Defendant and three friends walked back to Defendant's parents' trailer. Defendant removed a board and brick from the fence area of the trailer in order to get inside. At about 11:00 p.m., the group went to another friend's house

where they drank alcohol. About five to ten minutes later, they were then driven to another friend's house, where they stayed and drank more alcohol and watched movies for about two to three hours. At around 3:00 a.m., one of the friends, Gregg Aragon, became tired and proceeded to walk home, and Defendant insisted that he walk home with him. While they were walking, Defendant asked Mr. Aragon if he knew about Ted Bundy and "that Dahmer dude." Defendant further stated that he "was down with them guys" and did not "think they should have got caught doing what they were doing." The two arrived at the Mr. Aragon's house and watched television in the garage for about fifteen minutes. Defendant then stated that he wanted to return to his parents' trailer to replace the board he had removed earlier and left.

{3}     At about 8:00 a.m. on December 20, Maria Rachel Gutierrez called Lena Barrett (Victim) and noticed that the phone line was busy. After continuing to call Victim for about thirty minutes, Ms. Gutierrez and her daughter drove to Victim's house. Ms. Gutierrez entered the house through the front door, went into the kitchen and dining room and noticed that a chair was tipped over. She walked into the bedroom, noticed that the covers were off of the bed, and saw Victim lying on the floor. Ms. Gutierrez also noticed that the back door to Victim's bedroom was open. Ms. Gutierrez went to a local grocery store to inform Victim's daughter-in-law of what she had observed. After hearing about what had happened to Victim,

2

Clay Goret, the owner of the grocery store and the director of the Emergency Medical Services for Roy retrieved an ambulance, met another paramedic, Michael Montoya, and proceeded to Victim's house. Mr. Goret and Mr. Montoya entered Victim's house through the front door and proceeded to the back bedroom where they observed Victim lying on the floor. After observing that Victim was dead, the two exited the house.

{4}     Sheriff Fred Gift arrived at Victim's house and secured the scene. Mr. Montoya and Mr. Goret told Sheriff Gift that it appeared to be a murder. Sheriff Gift had a conversation with Mr. Aragon and Mr. Aragon told the Sheriff that he was with Defendant the previous night and that Defendant said, "I feel like pulling a Ted Bundy." Sheriff Gift and Officer Craig Martin searched the house and they observed evidence of a struggle: the dining room table was turned sideways, chairs were turned over, and several items were scattered over the kitchen floor. Sheriff Gift found a green rubber glove next to the door of the bathroom and another one on the bed in Victim's bedroom. Sheriff Gift also found several rubber gloves by the gate adjacent to the driveway at Defendant's parents' trailer. Sheriff Gift instructed Undersheriff Flowers to locate Defendant for questioning and informed him that Defendant had stayed the night at Stacie Monette's house. Undersheriff Flowers drove in a marked police unit to Ms. Monette's house and waited until Defendant and Ms. Monette's daughter, Kyra arrived. When Undersheriff Flowers

approached Defendant and Kyra, Defendant maintained eye contact with the undersheriff and did not seem alarmed, surprised, or curious. Undersheriff Flowers told Defendant, "I need you to fill out a voluntary statement if you wished, if you would." Defendant began to give Undersheriff Flowers a verbal account of the previous night's activities; Undersheriff Flowers asked him to write-out the statement and Defendant complied. Undersheriff Flowers noticed scratch marks on Defendant's face, which were not present when he had previously seen Defendant the night before at the dance. When Undersheriff Flowers asked Defendant about the scratches, Defendant smiled and said that he got them while crawling under the fence to his trailer. Undersheriff Flowers transported Defendant to the police station in Roy.

{5} Agent Gary Gold arrived on the scene and was informed that Defendant was in investigative detention for making a comment about wanting to hurt somebody and talking about Ted Bundy. Agent Gold went to the police station and asked Defendant if he wanted to give a statement. Defendant indicated that he wanted his parents present, so Agent Gold stopped the interview and waited for Defendant's parents to arrive. After they arrived, Agent Gold proceeded with the interview, in which Defendant gave Agent Gold an account of his activities on December 19 and 20. Agent Gold observed that Defendant had scratch marks on his face. Defendant told Agent Gold that he received the marks from a board at his parents' house.

4

After the interview, Agent Gold directed Agent Arthur Ortiz to take photographs of Defendant. Agent Gold conducted a second interview with Defendant after more evidence was gathered and interviews with other witnesses were conducted. Agent Gold testified that the second interview was "a little bit more heated" and that Defendant's account of the night did not coincide with Mr. Aragon's statement or the other information he had received from the officers involved with the crime scene.

{6}     Agent Ortiz collected Defendant's clothing, which included a gray T-shirt, a pair of Wrangler jeans, and a pair of black boots, and photographed him. When Defendant was removing his clothes, Agent Ortiz noticed that Defendant's boxer shorts were on backwards. Agent Ortiz examined Defendant's clothing and noticed reddish stains that were later confirmed to be blood on the jeans, one of the boots, and on a jacket that Defendant's father submitted to the police. Additionally, Agent Ortiz observed and photographed eleven different injuries on Defendant's body. He saw fresh scratches on Defendant's face, neck, inner forearm, left wrist, right knee, and inner thigh, as well as a bruise on his chest. Several witnesses who had seen Defendant the night before, testified that they did not notice any scratches on his face that night. Agent Ortiz also saw an abrasion on Defendant's left hand. Agent Ortiz testified that the injuries he observed on Defendant's body were consistent with injuries inflicted during a physical

5

altercation and in a defensive mode by a victim. Agent Ortiz collected hair and saliva samples, as well as fingerprints from Defendant for deoxyribonucleic acid (DNA) testing.

{7} In addition to the gloves found in Victim's home and in Defendant's parents' driveway, other gloves were also found inside Defendant's parents' trailer: one next to the living room and a few gloves were found in the washroom. The gloves found in Victim's home were the same type of gloves found in Defendant's parents' trailer. An empty box of latex gloves was also found in the trailer. Four days after the murder, Ms. Monette found a knife in her driveway and notified the police. Sheriff Gift collected the knife and examined it and observed blood and flesh on the blade. The knife was consistent in terms of color, size, and manufacturer, with a knife set in Victim's house. There was a knife missing from the set in Victim's house.

{8} A forensic pathologist from the Office of the Medical Investigator performed an autopsy on Victim's body and it revealed that Victim sustained blunt trauma injuries consisting of bruises, abrasions, and lacerations. There were also signs of strangulation as evidenced by petechial hemorrhages and a damaged hyoid bone and thyroid cartilage. The injuries consistent with strangulation were inflicted while Victim was alive. Victim had injuries consisting of scrapes and bruises on her arms, shoulder, and hands that were consistent with a physical

altercation, either in a defensive or aggressive mode. Victim also sustained twenty-eight stab or cutting injuries, including stab wounds on the lower cheek, forehead, nose, chest, abdomen, and across the neck. The stab wounds were inflicted while Victim was alive. The cause of death was blunt force and sharp force injuries of the head, neck, and thorax. The death was ruled a homicide. The pathologist also examined the photographs of the scratch marks on Defendant's face and concluded that the injuries were consistent with the types of wounds that would be inflicted by fingernails. The pathologist concluded that Defendant's injuries appeared to be fresh.

{9}     A forensic serologist conducted DNA testing on the samples collected from Defendant and the crime scene. The blood stains found on Defendant's jeans matched Victim's DNA and the blood found on the jacket contained DNA of both Victim and Defendant. The glove found in Victim's dining room contained DNA of Victim and Defendant, and the glove found on Victim's bed contained Victim's DNA. The serologist concluded that Defendant could be a contributor to the DNA found on the glove. Defendant's DNA was found on Victim's fingernails and Defendant's boot contained Victim's DNA. Also, the knife found in Ms. Monette's yard contained Victim's tissue.

{10}     Defendant was charged with an open count of murder contrary to NMSA 1978, Section 30-2-1 (1994), aggravated burglary contrary to NMSA 1978, Section

7

30-16-4(A) (1963), and tampering with evidence contrary to NMSA 1978, Section 30-22-5 (2003). A jury found Defendant guilty of first degree murder and not guilty of the other charges. Defendant appealed his first degree murder conviction to this Court.

**II.    DISCUSSION**

**A.      Defendant's Statement to Undersheriff Flowers**

{11}     During trial, after Undersheriff Flowers testified that Defendant had written a statement of his account of the night of December 19, the undersheriff began to testify as to what Defendant said as he was writing his statement when defense counsel objected. In the ensuing bench conference, defense counsel argued that anything Defendant said at that time was inadmissible because he had become a suspect, and since he was a minor, he should have had his rights read to him and his parents present. The State argued that Defendant was not a suspect at the time, Undersheriff Flowers was merely obtaining a witness statement as part of his investigation, and Defendant was not interrogated. The district court then asked, "The right goes to a custodial interrogation? Or it goes to any voluntary questioning. It goes to any questioning or only custodial? That's what I don't remember." Defense counsel answered "Custodial" and the court overruled the objection. When trial resumed, Undersheriff Flowers testified as to what Defendant had said regarding the night of December 19 and Defendant's written statement was admitted. On appeal, Defendant argues that his statement to

Undersheriff Flowers should not have been admitted at trial because he was not advised of his rights as required by NMSA 1978, Section 32A-2-14(C) (1993), part of the Delinquency Act. We agree with Defendant that the district court erred when it admitted Defendant's statement because at that time the statement was given, Defendant was suspected of being a delinquent child and thus he should have been read his rights pursuant to Section 32A-2-14(C). However, given the substance of Defendant's statement and the other evidence presented at trial, we hold that the error was harmless and affirm Defendant's first degree murder conviction.

## 1. Standard of Review

{12} "The admission or exclusion of evidence is within the sound discretion of the district court; that judgment will be set aside only on a showing of abuse of discretion." *State v. Barr*, 2009-NMSC-024, ¶ 29, 146 N.M. 301, 210 P.3d 198. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case[,]" *State v. Moreland*, 2008-NMSC-031, ¶ 9, 144 N.M. 192, 185 P.3d 363, or when the court "acted in an obviously erroneous, arbitrary, or unwarranted manner." *State v. Gallegos*, 2009-NMSC-017, ¶ 21, 146 N.M. 88, 206 P.3d 993 (internal quotation marks and citation omitted).

## 2. Defendant Was Suspected of Delinquent Activity Prior to the Questioning by Undersheriff Flowers

9

{13} The Delinquency Act provides: "No person subject to the provisions of the Delinquency Act who is alleged or *suspected* of being a delinquent child shall be interrogated or questioned without first advising the child of the child's constitutional rights and securing a knowing, intelligent and voluntary waiver." Section 32A-2-14(C) (emphasis added). Subsection (D) of this Section states:

> Before any statement or confession may be introduced at a trial or hearing when a child is alleged to be a delinquent child, the state shall prove that the statement or confession offered in evidence was elicited only after a knowing, intelligent and voluntary waiver of the child's constitutional rights was obtained.

Section 32A-2-14(D).

{14} This Court in *State v. Javier M.* concluded that the rights afforded children under the Delinquency Act are more expansive than those under *Miranda v. Arizona*, 384 U.S. 436 (1966), jurisprudence. 2001-NMSC-030, ¶¶ 1, 32, 131 N.M. 1, 33 P.3d 1. This Court held that "a child need not be subject to custodial interrogation in order to be afforded the right to be advised of his or her constitutional rights prior to police questioning"; rather, "the protections are triggered when a child is subject to investigatory detention." *Id.* ¶¶ 1, 29. An investigative detention, as described by the this Court, is ordinarily "when an officer approaches a child to ask the child questions because the officer 'suspects' the child of delinquent behavior." *Id.* ¶ 37.

{15} The *Javier M.* Court also addressed the consequences of Delinquency Act

violations: "If a child is not advised of the right to remain silent and warned of the consequence of waiving that right, any statement or confession obtained as a result of the detention or seizure is inadmissible in any delinquency proceeding." *Id.* ¶ 1. Thus, in order to determine if the district court erred in admitting Defendant's statement to Undersheriff Flowers, we must determine whether Defendant was suspected of delinquent activity and thus subject to an investigatory detention when he gave his statement to the undersheriff.

**{16}** In *Javier M.*, this Court concluded that the child defendant was subject to an investigatory detention and was not advised of his rights and thus, his statements to the police officer should have been suppressed. *Id.* ¶ 48. In that case, police officers were dispatched to an apartment in response to a noise complaint. *Id.* ¶ 2. As the officers approached the apartment, they heard loud music coming from inside and observed a female sitting on the stairwell outside the apartment door. *Id.* When the female saw the officers approaching, she yelled out a warning and ran into the apartment and closed the door. *Id.* The music was turned off and the officers could hear the occupants of the apartment scuffling around inside. *Id.* One of the officers, Officer Helton, detected odors of alcohol and marijuana coming from within the apartment. *Id.* The officers knocked on the door and twenty minutes later, someone opened the door. *Id.* When the door was opened, Officer Helton detected strong odors of alcohol and marijuana and saw several

11

empty beer cans around the apartment. *Id.* There were about ten to fifteen individuals inside. *Id.* Officer Helton and the other officers entered the apartment and began to separate the minors from the adults. *Id.* The officers decided to issue citations to the minors for curfew violations and ensure they would be taken home. *Id.*

{17} Officer Helton encountered the defendant in the living room of the apartment and the defendant neither appeared to be intoxicated nor had any alcohol in his possession. *Id.* ¶ 3. Officer Helton detected an odor of alcohol on the defendant's breath or clothing. *Id.* Officer Helton asked the defendant to step outside onto the stairwell of the apartment and once there, he asked the defendant for his name, age, and whether he had consumed any alcohol. *Id.* The defendant gave Officer Helton his information and answered that he had consumed two beers. *Id.* Officer Helton issued the defendant a citation for a curfew violation and for minor in possession of alcohol. *Id.* After the citations were issued, the defendant was taken home by another officer. *Id.*

{18} The Court articulated that "an objective standard would be used in evaluating whether the child is suspected of delinquent activity[.]" *Id.* ¶ 35. The Court concluded that Officer Helton "reasonably suspected that the [defendant] had committed or was committing a crime" and held that the defendant was subject to an investigatory detention. *Id.* ¶ 20. The Court based its conclusion on the fact

12

that the defendant was present at the location where the occupants appeared to be concealing activities from the officers and where there were odors of marijuana and alcohol detected and the fact that Officer Helton detected an odor of alcohol on the defendant's person. *Id.* The Court also concluded that the defendant was not free to leave when Officer Helton questioned him. *Id.*

{19} In the instant case it is clear that Defendant was suspected of delinquent activity and subject to an investigatory detention when Undersheriff Flowers questioned him. Prior to his questioning, the police unearthed evidence that implicated Defendant in Victim's killing—rubber gloves, similar to those found at Victim's house, were found at Defendant's parents' trailer, and a witness statement that on the night of December 19, Defendant said, "I feel like pulling a Ted Bundy." This was similar to *Javier M.*, where officers observed empty beer cans in the apartment and the questioning officer detected an odor of alcohol on the defendant prior to questioning him. Unlike *Javier M.*, where the officers confronted the defendant while he was at the scene of the suspected delinquent activity, Undersheriff Flowers left the scene and actively searched for Defendant so that he could question him. In fact, Undersheriff Flowers was instructed by his commanding officer, Sheriff Gift, to locate Defendant for questioning. This further indicates that the investigating officers suspected Defendant.

{20} Additionally, the nature of the encounter between Undersheriff Flowers and

Defendant indicates that Defendant was subject to an investigatory detention. Undersheriff Flowers drove his police unit to the place where Defendant was staying and waited there until Defendant arrived. Defendant arrived with Kyra and Undersheriff Flowers approached Defendant and told him, "I need you to fill out a voluntary statement if you wished, if you would." Kyra asked if she needed to make a statement as well, but Undersheriff Flowers told her, "I'd like for [Defendant] to right now." Defendant began to give Undersheriff Flowers a verbal account of the previous night's activities, when Undersheriff Flowers asked him to write out the statement. Also, after noticing scratch marks on Defendant's face, Undersheriff Flowers questioned Defendant about them.

{21}     Given the evidence that the investigating officers obtained before Defendant's questioning, and evaluating the circumstances under an objective standard, Defendant was suspected of delinquent activity prior to his questioning by Undersheriff Flowers. This suspicion, coupled with the manner in which Undersheriff Flowers conducted the questioning, placed Defendant in an investigatory detention. Thus, the rights provided by the Delinquency Act were triggered and Defendant should have been read his rights prior to Undersheriff Flowers' questioning. Accordingly, Defendant's statement to the undersheriff should have been suppressed and the district court erred when it admitted the statement at trial.

### 3. Admission of Defendant's Statement to Undersheriff Flowers Was Harmless Error

{22} Having concluded that the district court erred when it admitted Defendant's statement to Undersheriff Flowers, we now must determine if the error was harmless. Where the error in question is a violation of statutory law, such "a non-constitutional error is harmless when there is no reasonable *probability* the error affected the verdict." *State v. Barr*, 2009-NMSC-024, ¶ 53, 146 N.M. 301, 210 P.3d 198. Reviewing courts consider three factors when determining whether an error is harmless:

> [W]hether there is: (1) substantial evidence to support the conviction without reference to the improperly admitted evidence; (2) such a disproportionate volume of permissible evidence that, in comparison, the amount of improper evidence will appear minuscule; and (3) no substantial conflicting evidence to discredit the State's testimony.

*Id.* ¶ 56 (footnote omitted). These factors "are considered in conjunction with one another . . . [and] provide a reviewing court with a reliable basis for determining whether an error is harmless." *Id.* ¶ 55.

{23} Applying the first factor, we conclude that there was substantial evidence to support Defendant's conviction without reference to the statement he made to Undersheriff Flowers. Primarily, there was overwhelming DNA evidence that implicated Defendant: the DNA found on Defendant's jeans matched that of Victim; a stain on Defendant's jacket contained a mixture of DNA from Defendant and Victim; the rubber gloves found in Victim's dining room and on Victim's bed

15

contained DNA of Defendant and Victim; Defendant's boot contained Victim's DNA; and Victim's fingernails contained Defendant's DNA. Defendant also had injuries on his body, consistent with injuries inflicted in a defensive mode by a victim. Specifically, he had fresh scratch marks on his face that were consistent with the types of wounds that would be inflicted by fingernails. Several witnesses also testified that they did not see the scratches on Defendant's face the night of December 19, but did notice them the next morning. Also, green rubber gloves similar to the ones found at Victim's house, along with an empty box of latex gloves, were found at Defendant's parents' trailer. In addition to the physical evidence, there was evidence Defendant had asked his friend if he knew about Ted Bundy and "that Dahmer dude" and told his friend that he "was down with them guys" and did not "think they should have got caught doing what they were doing." Thus, the first factor weighs in favor of the error being harmless.

{24}    Regarding the second factor, given the great amount of evidence supporting the verdict, there was a disproportionate volume of permissible evidence that rendered the improper statement to Undersheriff Flowers minuscule in comparison. The improperly admitted evidence amounted to an exculpatory statement in which Defendant told Undersheriff Flowers his account of his activities on the night of December 19. When compared to the volume of permissible evidence, the impact of Defendant's statement to Undersheriff Flowers was inconsequential. Thus, this

16

factor also weighs in the favor of harmlessness.

{25} The third factor is whether there was no substantial conflicting evidence to discredit the State's evidence. Given that Defendant's statement indicated that Defendant never entered Victim's house, much less that he killed her, its admission did present conflicting evidence that would discredit the State's evidence. However, despite the fact that the impermissible statement did conflict with the other evidence, Defendant's mere account of his activities on the night of December 19 does not rise to the level of "substantial" conflicting evidence. This factor also weighs in favor of the error being harmless.

{26} After weighing the three factors, we conclude that there was no reasonable probability that the admission of Defendant's statement to Undersheriff Flowers affected the verdict and thus, the district court's error in admitting Defendant's statement to Undersheriff Flowers was harmless.

**B. Motion for New Trial**

{27} After trial, Defendant moved for a new trial based on the fact that one of the jurors (Juror) had failed to disclose that she had previously employed Victim's brother to install fencing on her property. No other information pertaining to the relationship of Juror and Victim's brother was provided. Defendant argues that the relationship between Juror and a member of Victim's family should have disqualified her from serving on the jury and that her presence on the panel denied

17

his right to a fair and impartial jury. In response, the State argued that there was no evidence that Juror failed to respond truthfully and that Defendant failed to show impartiality. The district court denied Defendant's motion. We affirm.

**{28}** "[W]e will not disturb a trial court's exercise of discretion in denying or granting a motion for a new trial unless there is a manifest abuse of discretion." *State v. Moreland*, 2008-NMSC-031, ¶ 9, 144 N.M. 192, 185 P.3d 363 (internal quotation marks and citation omitted). A criminal defendant is guaranteed a trial by jury and that jury must be fair and impartial. U.S. Const. amend. VI; N.M. Const., art. II, §§ 12, 14. An impartial jury is "where each and every one of the twelve members constituting the jury is totally free from any partiality whatsoever." *State v. McFall*, 67 N.M. 260, 263, 354 P.2d 547, 548 (1960). "If a juror falsely represents his interest or situation or conceals a material fact relevant to the controversy and such matters, if truthfully answered, might establish prejudice or work a disqualification of the juror, the party misled or deceived thereby" may move for a new trial. *Mares v. State*, 83 N.M. 225, 227, 490 P.2d 667, 669 (1971) (internal quotation marks and citation omitted). The party making such a claim has the burden of establishing partiality and must show: (1) a relationship "between the juror's erroneous answer and his capacity to sit as an impartial juror[;]" and (2) "actual prejudice . . . stemming from the juror's answers on voir dire." *State v. Pierce*, 109 N.M. 596, 600, 788 P.2d 352, 356 (1990).

**{29}** Assuming that Juror's non-disclosure of the fact that she had hired Victim's brother was either a misrepresentation or a concealment of a material fact for purposes of this analysis, Defendant nonetheless failed to meet his burden of showing impartiality. The only fact that Defendant brought forth in support of his motion for a new trial was that Juror had previously employed Victim's brother to install fencing on Juror's ranch. He did not provide any other evidence pertaining to the nature or duration of the relationship and thus, he did not establish that there was a relationship between Juror's concealment and her capacity to serve as an impartial juror. Furthermore, Defendant did not establish that he suffered actual prejudice as a result of Juror's concealment and offered only a bare assertion that he "was prejudiced by the fact that th[e] connection [between Juror and Victim's brother] was not revealed during voir dire, [and] that the jury was rendered partial by this failure . . . ." Because Defendant did not bring forth any evidence from which partiality on the part of Juror could be established, we cannot hold that the district court abused its discretion when it denied Defendant's motion for a new trial. The denial of Defendant's motion for a new trial is affirmed.

**C.    Motion for Mistrial**

**{30}** During trial, Agent Carlos Mendoza testified that the reason why Defendant was taken into investigative detention was because Defendant "had made a statement about doing a Bundy killing." The prosecution then asked, "Ted Bundy,

19

is that a name that law enforcement recognized." Agent Mendoza replied, "Yes. I think people in general, too." After this response, the prosecution asked, "Without going into too much detail, what is there about the name Ted Bundy that raised suspicion?" Before Agent Mendoza could respond, Defendant's counsel objected and a bench conference ensued. During the bench conference, Defendant argued that the mention of Ted Bundy being a serial killer is "highly prejudicial and in no way relevant to th[e] case." The court stated that the testimony would be relevant, in part, to show Defendant's intent in making the statements. Defendant then requested that the court limit the witnesse's testimony to the fact that Ted Bundy was known to commit a homicide and not allow the witness to testify as to the number of homicides that Bundy committed or to use the phrase, "serial killer." The court agreed with Defendant and disallowed the use of the phrase "serial killer" and the bench conference concluded.

{31}     When trial resumed, the prosecution then asked Agent Mendoza, "why was the name Ted Bundy significant in raising, . . . suspicion or questions about [Defendant]?" Officer Mendoza responded, "Because he's a serial – known serial killer." Defense counsel objected and during the ensuing bench conference, moved for a mistrial, contending that the prosecution disobeyed the court's ruling, which precluded the use of the phrase "serial killer" and that the testimony was "highly prejudicial[] and it prejudice[d] the Defense . . . ." The court responded, "I don't

20

believe that the D.A. intentionally went into or asked about 'serial killer,' and I'm prepared to make a limiting instruction that would instruct the witness not to go into that and to instruct the jury that there is not an issue or contention that the Defendant in this case is a serial killer." The court then instructed Agent Mendoza not to "address the nature of someone being a serial killer" and instructed the jury that there was no contention that Defendant was a serial killer. Citing *State v. Franklin*, 78 N.M. 127, 428 P.2d 982 (1967) and *State v. Boyer*, 103 N.M. 655, 712 P.2d 1 (Ct. App. 1985), Defendant argues that Agent Mendoza's utterance of the phrase "serial killer" poisoned the minds of the jury and prejudiced his defense and that the court's instruction to the jury was insufficient to alleviate the prejudice. We disagree.

**{32}** "The power to declare a mistrial should be exercised with the greatest caution[,]" *State v. Smith*, 2001-NMSC-004, ¶ 32, 130 N.M. 117, 19 P.3d 254 (internal quotation marks and citation omitted), and "[w]e rely upon the judgment of the trial court because [it] is in a much better position to know whether a miscarriage of justice has taken place and his opinion is entitled to great weight in the absence of a clearly erroneous decision." *Id.* (internal quotation marks and citation omitted). Accordingly, "[w]e review a trial court's denial of a motion for mistrial under an abuse of discretion standard." *State v. Gallegos*, 2009-NMSC-017, ¶ 21, 146 N.M. 88, 206 P.3d 993 (internal quotation marks and citation

21

omitted).

{33} Regarding curative instructions, "[t]he jury is presumed to follow the court's instructions[,]" *State v. Gonzales*, 113 N.M. 221, 230, 824 P.2d 1023, 1032 (1992), and "[t]he overwhelming New Mexico case law states that the prompt sustaining of the objection and an admonition to disregard the answer cures any prejudicial effect of inadmissible testimony." *State v. Gonzales*, 2000-NMSC-028, ¶ 37, 129 N.M. 556, 11 P.3d 131 (internal quotation marks and citation omitted).

{34} Any prejudicial effect that Agent Mendoza's utterance of the phrase "serial killer" could have had on the jury was cured by the district court's subsequent admonition of Agent Mendoza and curative instruction to the jury. Thus, the district court did not abuse its discretion in denying Defendant's motion for a mistrial.

## III.  CONCLUSION

{35} Defendant was suspected of delinquent activity prior to Undersheriff Flowers' questioning and thus Defendant's rights under Section 32A-2-14(C) of the Delinquency Act were violated when the undersheriff did not inform Defendant of his rights. Thus, we hold that the district court erred when it admitted Defendant's statement to Undersheriff Flowers. However, given the substantial evidence supporting the conviction without referencing the impermissibly admitted

evidence, the district court's error was harmless. The district court did not abuse its discretion when it denied Defendant's motions for a new trial and for a mistrial. Defendant's conviction is affirmed.

{36}    **IT IS SO ORDERED**.

_____

**PATRICIO M. SERNA, Justice**

**WE CONCUR:**

_____

**CHARLES W. DANIELS, Chief Justice**

_____

**PETRA JIMENEZ MAES, Justice**

23

_____

**RICHARD C. BOSSON, Justice**


_____

**EDWARD L. CHÁVEZ, Justice**