This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: May 14, 2026**

**No. S-1-SC-40650**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**DANIEL N. FLORES, JR.,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CHAVES COUNTY**
**James M. Hudson, District Judge**

Bennett J. Baur, Chief Public Defender
Kimberly Chavez Cook, Appellate Defender
Joelle N. Gonzales, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Santa Fe, NM
Walter M. Hart, III, Assistant Attorney General
Albuquerque, NM

for Appellee

**DECISION**

**BACON, Justice.**

**{1}** On an early Sunday morning in July 2022, a masked shooter opened fire on a group of teenagers gathered at a home in southeastern Roswell. Fifteen-year-old Damyn Rodriguez (Victim) was shot and killed. Three other teenagers were injured in

the gunfire. The primary resident of that home, Angelita Duran, was threatened by the shooter but was not injured. The State identified Angelita's recent ex-boyfriend, Defendant Daniel Flores, as the shooter after his cell phone and truck were found near the crime scene. Defendant disputed this identification at trial; but a jury subsequently convicted him of murder and aggravated assault.

**{2}** Defendant now seeks to overturn these convictions on appeal. He claims the district court abused its discretion in admitting several exhibits, including photographs showing Defendant posing with firearms and reports showing the text messages and images extracted from his cell phone. Defendant also challenges the lay opinion testimony of an investigating officer about several street camera videos which showed Defendant's truck circling Angelita's neighborhood shortly before the shooting. For the reasons discussed herein, we reject Defendant's evidentiary challenges and affirm his convictions. We resolve this appeal through a nonprecedential decision because the issues are answerable by existing law. Rule 12-405(B)(1), (3) NMRA.

## I.    BACKGROUND

**{3}** Officers received reports of shots fired in a residential neighborhood in southeastern Roswell around 3:00 a.m. on Sunday, July 24, 2022. The shooting took place at Angelita's house. Angelita was at home visiting with her friend Marissa Rivera, Victim, and two other teenaged boys at the time. Earlier that evening, the group had been out driving around Roswell in Marissa's vehicle; but they had decided to settle at Angelita's home before the shooting. The teenagers were drinking, smoking, and listening to music around the kitchen table when they noticed the headlights of a vehicle pulling up outside the house. One of the teenagers opened the front door to see who had arrived.

**{4}** Peering into the dark outside, Angelita saw a larger male who was wearing a mask and dressed in dark or black clothing. Marissa saw a black figure with a gun. The masked shooter moved aggressively towards the house, lifted the weapon, and opened fire. One of the shots grazed Marissa's chin and struck a nearby door. Another shot struck Victim in the neck. Subsequently he collapsed and died on the kitchen floor. One of the other boys was shot in the arm; the other was shot in the chest. Both boys survived their injuries.

**{5}** Angelita was threatened by the shooter but was not shot. She took off running down the street towards a nearby family member's home. Marissa, who had covered her face after the initial shots, surveyed the others' injuries and then joined Angelita down the street once she realized the shooter was gone. The two surviving boys went outside screaming for help, and a few neighbors called 911.

**{6}** While enroute to the scene, one of the responding officers spotted a man walking in Angelita's neighborhood but did not stop the individual. According to the officer, the man was heavy-set and wore a black shirt, jeans, and white shoes.

**{7}** Officers did not find any firearms or spent shell casings at the scene, although they located a holster and an unspent magazine in one of Angelita's closets. Based on the absence of spent casings and on bullet fragments recovered from the scene, a forensic firearms examiner opined that the shooter likely used either .38, .357, or .9mm caliber bullets in either a .38 caliber special revolver or .357 caliber magnum revolver.

**{8}** Officers noted an unoccupied green Ford F-150 pickup parked on the street outside Angelita's home after the shooting. The truck was not running but had its headlights on. At trial, Angelita and Marissa testified that the Ford F-150 had not been there when the teenagers arrived at Angelita's home. Inside the Ford F-150, officers found an unspent .38 caliber cartridge on the passenger seat and a cloth bag filled with more bullets in the glove box. Street-camera videos recorded the green Ford F-150 driving around the surrounding neighborhood in the hour and minutes before the shooting. At trial, Officer Matthew Pacheco testified that, due to certain shadows, reflections, and other details visible in the videos, he believed a male wearing dark clothing was driving the truck and another individual, who appeared to be vaping or smoking, was sitting in the passenger seat.

**{9}** Officers also observed several small, personal items scattered about the front yard of Angelita's home and a trail of items and footprints leading down the street. Following the trail, officers found a relatively new Apple iPhone SE on the ground in an alley near the crime scene. At the top of a nearby trash bin, officers also discovered a large-sized black t-shirt and dark gray pants which matched the description of the shooter.

**{10}** The green Ford F-150 parked outside Angelita's home was registered to Defendant's grandfather and had been lent to Defendant by his family members. Defendant was also listed as the device owner of the iPhone recovered near the scene. Defendant had dated Angelita and had lived at her home off and on for several years prior to the shooting. However, Defendant and Angelita had broken up just a few hours before the shooting.

**{11}** During the investigation, Angelita told officers that the masked shooter had said "Open the f*cking door!" and "If you don't move, I'll shoot you!" before she took off running. She also said the shooter's voice "sounded like" Defendant and, "I feel like I know it was him"; but she seemed reluctant to confirm these statements at trial. However, Angelita confirmed Defendant had previously told her that, if he saw her with other men, he would kill both "[her] and him." Due to inconsistencies in Angelita's testimony, it is unclear whether Defendant made this threat during the shooting or during an earlier fight.

**{12}** The State charged Defendant with the first-degree murder of Victim and aggravated assault on Angelita. At trial, the State argued that Defendant was an "angry ex" who committed the shooting either alone or with an unidentified accomplice because he "wouldn't let Angelita go and didn't want her hanging out with other boys." Defendant disputed the State's theory and contended that some unknown person was at fault. Defendant testified that he broke up with Angelita the night before the shooting because

he wanted to move to Arizona to live with his mother. He claimed that he left Angelita's home several hours before the incident and stayed at his sister's house for the rest of the night.

**{13}** Defendant further testified that, after he broke up with Angelita, he left the green Ford F-150 and the iPhone at Angelita's house. Defendant claimed that he and Angelita shared the iPhone and he decided to leave it with her. Defendant also asserted he left his Ford F-150 because he never learned to drive and could not drive the vehicle. Finally, Defendant testified that he did not have access to a firearm at the time of the incident, although he admitted he had possessed guns in the past and was interested in firearms.

**{14}** The jury found Defendant guilty of first-degree murder and aggravated assault. He appeals these convictions directly to this Court. N.M. Const. art. VI, § 2.

## II.    DISCUSSION

**{15}** Defendant raises several evidentiary issues on appeal. "We generally review the admission or exclusion of evidence for abuse of discretion, although we apply a de novo standard to any interpretation of law underlying the evidentiary ruling." *State v. Soto*, 2025-NMSC-051, ¶ 31, 580 P.3d 781. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Samora*, 2016-NMSC-031, ¶ 37, 387 P.3d 230 (internal quotation marks and citation omitted).

**{16}** We first address Defendant's arguments pertaining to several images and photographs introduced at trial. Next, we review Defendant's challenge to the admission of a report showing the text messages extracted from the iPhone recovered near the scene. Finally, we discuss Defendant's arguments regarding the admissibility of Officer Pacheco's testimony about the street camera videos showing Defendant's truck. Because we see only one harmless error relating to use of a photograph containing the word "Southside," we reject Defendant's cumulative error claim. *See State v. Carrillo*, 2017-NMSC-023, ¶ 53, 399 P.3d 367 (rejecting a cumulative error claim "[b]ecause we find only one error at trial, an error which was harmless").

### A.    Challenges to Images and Photographs

**{17}** Defendant argues the district court abused its discretion in admitting several images and photographs, asserting this evidence was irrelevant, unfairly prejudicial, and used only to suggest that he was affiliated with a gang and had a propensity for violent crime. Under our Rules of Evidence, relevant evidence is evidence that "has any tendency to make a fact [of consequence to an action either] more or less probable." Rule 11-401 NMRA. Generally, all relevant evidence is admissible unless otherwise provided by law. Rule 11-402 NMRA. But relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Rule 11-403 NMRA. "Unfair prejudice, in the context of Rule 11-403, means an undue

tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Bailey*, 2017-NMSC-001, ¶ 16, 386 P.3d 1007 (internal quotation marks and citation omitted). However, "the fact that evidence is prejudicial is not grounds for excluding it; exclusion is required only when the danger of 'unfair' prejudice outweighs the legitimate prejudice that is otherwise known as probative value." *State v. Ruiz*, 1995-NMCA-007, ¶ 12, 119 N.M. 515, 892 P.2d 962 (citation omitted).

**{18}** Further, even if relevant, "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Rule 11-404(B)(1) NMRA; *see also* Rule 11-404(A)(1) (addressing admission of evidence bearing on a person's character or character trait). "Rule 11-404 excludes propensity evidence because it injects a prejudicial effect into the proceeding that substantially outweighs the benefits of whatever slight, probative value it may have and creates the unnecessary risk that a jury will convict a defendant on the basis of former behavior and not the conduct charged." *State v. Fernandez*, 2023-NMSC-005, ¶ 18, 528 P.3d 621 (internal quotation marks and citation omitted). But evidence of a person's uncharged acts may be admitted for a purpose other than showing propensity, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 11-404(B)(2). This "list of permissible uses [for this other-acts] evidence is not exhaustive." *State v. Romero*, 2019-NMSC-007, ¶ 27, 435 P.3d 1231. The proponent of the evidence must cogently explain what rationale other than propensity supports admission. *State v. Cardenas*, 2025-NMSC-020, ¶ 32, 572 P.3d 958. And "even if other-acts evidence is relevant to something besides propensity, such evidence will not be admitted if the probative value related to its permissible purpose is substantially outweighed by" the risk of unfair prejudice. *State v. Gallegos*, 2007-NMSC-007, ¶ 22, 141 N.M. 185, 152 P.3d 828. Accordingly, before the district court may admit evidence of a person's uncharged conduct, the "court must find that the evidence is relevant to a material issue other than the defendant's character or propensity to commit a crime, and must determine that the probative value of the evidence outweighs the risk of unfair prejudice, pursuant to Rule 11-403." *State v. Otto*, 2007-NMSC-012, ¶ 10, 141 N.M. 443, 157 P.3d 8.

## 1. Images of firearms and masked man show identity and opportunity

**{19}** Defendant first challenges admission of State's Exhibit 5, which is a report of gallery images extracted from the iPhone that was registered to Defendant and recovered near the crime scene. Exhibit 5 consists of a grid of thumbnail-sized images and associated metadata. Several of these images appear to be self-portraits or "selfies" of Defendant and Angelita taken either alone or as a couple. There are also multiple images of firearms. Most of the firearms are shown in profile and displayed alone against a blank white screen or alongside text and prices, suggesting the images may be screenshots or pictures downloaded from an online retailer. A few images portray a firearm in an environment, either propped up or in an unidentified person's hands. There is also one selfie of an unidentified man wearing a black ski mask and

holding a lit cigarette. The photo of the masked man was created on the iPhone a few days prior to the shooting.

**{20}** At trial, Defendant objected to admission of Exhibit 5, arguing that the images of firearms and the unidentified masked man were irrelevant and unfairly prejudicial. The State asserted that the multiple images of firearms were relevant to prove that Defendant had access to a gun to commit the shooting. The State further contended the image of a man wearing a ski mask was relevant because it tended to show that Defendant was "contemplating th[e] concept" of a mask, even if Defendant was not actually the masked man depicted in the image. The district court admitted Exhibit 5, concluding that the images of firearms were relevant because "the ownership of guns is a disputed fact in this matter." The district court also determined the images of firearms were not unfairly prejudicial because several of the jurors indicated they had firearms during voir dire and "the Second Amendment says you have a constitutional right to own firearms." The district court agreed that the picture of the masked man "having been downloaded from some source, could be an act by the defendant" consistent with evidence suggesting the shooter wore a mask and thus was relevant and admissible.

**{21}** On appeal, Defendant asserts the images of firearms and a masked man in Exhibit 5 are not probative of any material fact and unfairly prejudicial insofar as they were used to make the jury think that Defendant was the type of person who engages in criminal activity. The State proffers the images as relevant to Defendant's identity as the masked shooter and Defendant's access to a gun to commit the shooting.

**{22}** On review, we conclude the images were relevant for a purpose other than showing propensity. Rule 11-404(B)(2). Typically, evidence of a firearm that was not used in the underlying offense is not relevant to proving the charged crime. *State v. Jones*, 2025-NMSC-049, ¶¶ 50-51, 580 P.3d 216. For example, in *Jones*, we concluded the district court erred in admitting evidence of multiple firearms and accessories in the defendant's bag, as the police discovered the firearms nearly two years after the incident and there was no indication that the firearms were connected to the charged crime. *Id.* ¶¶ 7, 44-52. However, we acknowledged that evidence of an unrelated firearm may be relevant if there is some rational connection between the evidence and the underlying offense. *See id.* ¶¶ 51-52.

**{23}** We conclude that this case is distinguishable from *Jones*, as there is a rational link between the gallery images of potentially unrelated firearms in Exhibit 5 and the charged conduct. In this case, no murder weapon was found. Forensic evidence only narrowed, but did not conclusively establish, what kind of firearm the shooter may have used. And, other than the unspent .38 caliber bullets recovered in Defendant's truck, there was no physical evidence that connected Defendant to a potential firearm used in the shooting. Defendant further testified that he did not have a gun at time of the incident. Evidence showing Defendant's access to a firearm was therefore central to establishing Defendant's ability to carry out the shooting. And the State primarily sought to establish Defendant's access to a gun through circumstantial evidence, such as through the images in Exhibit 5.

**{24}** Although Exhibit 5 did not provide strong evidence of Defendant's access to a firearm, the exhibit tended to show that someone, very likely Defendant, downloaded or created multiple images of guns on his iPhone prior to the shooting. Given the number, timing, and layout of the images, the jury could reasonably infer that Defendant had shopped for a gun or took pictures of a gun before the shooting. In fact, one of the images in Exhibit 5 was created around 1:00 a.m. on July 24, 2022—around two-hours before the shooting—and shows an unknown person's hands holding the back of a gun. The timing and content of this image suggests Defendant may have had a firearm shortly before the charged offense. The images of firearms in Exhibit 5 were therefore relevant for a purpose other than showing propensity, that is, to show Defendant's opportunity to commit the crimes. Opportunity under Rule 11-404(B) is associated with mental and physical ability to commit the charged offense, *State v. Martinez*, 2021-NMSC-002, ¶¶ 96-97, 478 P.3d 880, which may include the defendant's access to a firearm. *See also State v. Casillas*, S-1-SC-32911, dec. ¶¶ 17-19 (N.M. May 9, 2013) (nonprecedential) (determining that testimony about the defendant's earlier possession of a potentially unrelated firearm was relevant as circumstantial evidence to link the defendant to the charged offense), *cited by Jones*, 2025-NMSC-049, ¶ 52.

**{25}** We also conclude that the image of the unidentified man in a ski mask was relevant to identity. Evidence of uncharged conduct may be relevant to identity "when identity is at issue and when the similarity of the other [acts] demonstrates a unique or distinct pattern easily attributable to one person." *Martinez*, 2021-NMSC-002, ¶ 99 (internal quotation marks and citation omitted). The identity of the masked shooter was the primary issue at trial. Angelita variously testified that the shooter wore a mask or "Halloween mask." Even if Defendant was not the unidentified masked man in the image, the fact that Defendant may have downloaded or created an image of a man wearing a mask a few days before the shooting makes it more probable that Defendant had a mask or knew where to get such a mask to commit the charged crimes. The image of the masked man is therefore relevant to show Defendant's appearance as potentially consistent with that of the masked shooter. *See State v. Rackley*, 2000-NMCA-027, ¶ 16, 128 N.M. 761, 998 P.2d 1212 (concluding that a mugshot photo of the defendant was admissible to show that the defendant's "appearance was consistent with the appearance of the unidentified person seen running near the scene of the crime").

**{26}** We recognize the images provide only circumstantial evidence of identity and opportunity. However, Exhibit 5 also carries strong probative value to the issues in this case, as the exhibit is a report of gallery images extracted from the iPhone recovered near the crime scene. Exhibit 5 was therefore also relevant to the jury's deliberations on Defendant's contention that he shared the phone with Angelita and the implication that she, rather than Defendant, had the phone at the time of the shooting and dropped it in the alley while running away from the scene. Even though guns and black ski masks carry connotations of illegal activity, the thumbnail-sized images in Exhibit 5 display these objects passively on a blank background or in a neutral environment. In view of these circumstances, we conclude the district court reasonably determined that the probative value of Exhibit 5 was not substantially outweighed by the risk of unfair

prejudice. Rule 11-403. The district court therefore did not abuse its discretion in admitting Exhibit 5.

## 2.     Photographs and images obtained from Defendant's Facebook profile

{27}    We next address Defendant's challenge to the admission of State's Exhibits 86, 87, 88, and 97, which are four photographs that officers obtained from Defendant's Facebook profile. Two of these photographs show the top of the profile. The other two photographs are pictures posted on the profile which show Defendant posing with guns. Defendant claims these exhibits are irrelevant, unfairly prejudicial, and introduced only to suggest he was affiliated with a gang and had a propensity for violent crime. The parties agree that the State presented no evidence that Defendant was in a gang or that the shooting was gang-related. We evaluate the parties' arguments about these photographs in the next two subsections.

### a.     The Southside banner is inadmissible but harmless character evidence

{28}    Defendant challenges the admission of Exhibits 86 and 97, which are print-outs of Defendant's Facebook profile. Exhibit 86 is a partial screenshot of the top of the profile. The exhibit shows Defendant's name and nickname (Heavy D) next to a thumbnail-sized image of Defendant and his nephew. Along the top of the exhibit, there is a banner partially displaying the word "Southside" in stylized font on a white background. Towards the bottom, there is a notification that Defendant updated his profile picture in September 2021. Exhibit 97 is a close-up of the Southside banner showing it was updated on June 7, 2021.

{29}    Prior to trial, the State proffered Exhibit 86 as relevant to establish Defendant's control over the Facebook account where he had posted Exhibits 87 and 88, the photographs depicting him with guns. The State also suggested Exhibit 86 was relevant to show "Defendant's affiliations and/or prominence in displaying his 'Southside' affiliation, whatever those may be." However, the district court only admitted Exhibit 86 for purposes of authenticating the other exhibits. The district court also concluded that the Southside banner did not make Exhibit 86 so unfairly prejudicial to be inadmissible under Rule 11-403.

{30}    At trial, the State introduced Exhibit 86 through the testimony of Detective Gino Basile. Detective Basile testified that Exhibit 86 showed Defendant's Facebook profile. Detective Basile also briefly testified the stylized lettering at the top of the profile "says Southside." Later, during Defendant's direct examination, defense counsel asked Defendant: "Were you a member, ever, of any gang or affiliation known as Southside?" Defendant responded, "No, I was not." Defendant further explained he posted the Southside banner "when I was in middle school and, I just, I thought it was cool to be in a gang, I guess, but I never got officially, like, ranked in. I was never a gang member or nothing like that. That was, that picture's old. . . . It's a middle school thing." In response to this testimony, the State introduced Exhibit 97, the close-up of the Southside banner, on cross-examination to impeach Defendant on the age of the banner. During closing

arguments, the State briefly referenced "Southside" and suggested Defendant evinced a "wannabe affiliation with a gang."

**{31}** Defendant argues the district court abused its discretion in admitting Exhibit 86 under Rule 11-404(B)(2). However, the district court did not admit Exhibit 86 as other-acts evidence under Rule 11-404(B)(2) but instead admitted the exhibit only for the purpose of authenticating the other social media evidence. *See* Rule 11-901(A) NMRA (addressing the authentication of evidence); *State v. Jesenya O.*, 2022-NMSC-014, ¶ 18, 514 P.3d 445 ("[T]he authentication of social media evidence is governed by the traditional authentication standard set out in Rule 11-901."). From the State's arguments, however, we discern that the Southside banner was used to argue that Defendant possessed the character trait of a "wannabe" gang member. And the State, in its briefing, argues it properly used Exhibits 86 and 97 to rebut Defendant's self-portrayal as someone who would not commit the crime. The admissibility of such character evidence is governed by Rule 11-404(A).

**{32}** Rule 11-404(A)(1) provides, "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." However, "a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it." Rule 11-404(A)(2)(a). A defendant "opens the door to counterattacks on character" by introducing testimony on reputation or character or "by testifying beyond background information and presenting self-portraits as [a] person[] whose experience, personality, philosophy, and disposition make it less likely that they committed the crime." *Cardenas*, 2025-NMSC-020, ¶ 35 (internal quotation marks, ellipsis, and citations omitted). "[W]hen a defendant places a pertinent character trait at issue, the state's rebuttal evidence is limited to evidence bearing on that trait." *State v. Soto*, 2025-NMSC-051, ¶ 38 (emphasis omitted).

**{33}** The State asserts Defendant opened the door to character evidence by presenting an "'angel' image" to the jury, which the Southside banner rebutted by "show[ing] a harder edge to Defendant's mentality, state of mind, and thought process." The State identifies two aspects of Defendant's testimony to argue that Defendant portrayed himself as angelic. First, Defendant told the jury that he decided to break-up with Angelita and move to Arizona, stating: "I wanted to do better. I wanted to go out and get a job, and you know, do better," and Angelita "would hold me back from doing a lot of things." Second, Defendant testified he heard about the shooting after he moved to Arizona and decided to travel back to New Mexico when he heard there was a warrant for his arrest.

**{34}** Neither of these statements sufficiently opened the door to rebuttal character evidence under Rule 11-404(A)(2)(a). In *Cardenas*, we concluded the defendant had not opened the door to counterattacks on her character as a peaceful, law-abiding citizen or a good mother because her testimony about her lack of criminal history and plans for her daughter was "focused on background information and facts relevant to the charged crime." 2025-NMSC-020, ¶¶ 36-40. Similarly, Defendant's testimony explained his reasons for breaking-up with Angelita and going to Arizona after the

shooting. These facts were directly relevant to the State's theory that Defendant's motive for committing the shooting was to intimidate his recent ex-girlfriend and that his moving to Arizona was evidence of flight. "Only if the defendant-witness ranges beyond these basic background and relevant facts to personally self-identify to a jury as the kind of person who would not engage in the charged crime does the character-evidence door open." *Id.* ¶ 40 (brackets, internal quotation marks, and citation omitted).

**{35}** The State in this proceeding therefore improperly commented on Defendant's "wannabe" gang affiliation in closing arguments. As the State does not advance any other theory to support admissibility of this evidence, we conclude Exhibit 86 was erroneously admitted as evidence of Defendant's character trait in contravention to Rule 11-401(A)(1).

**{36}** Even though we determine that Exhibit 86 was inadmissible character evidence, "Improperly admitted evidence is not grounds for a new trial unless the error is determined to be harmful." *State v. Tollardo*, 2012-NMSC-008, ¶ 25, 275 P.3d 110; *accord State v. Barr*, 2009-NMSC-024, ¶ 48, 146 N.M. 301, 210 P.3d 198 (noting that the "harmless error rule . . . require[s] appellate courts to affirm lower courts notwithstanding technical errors, defects, or exceptions which [did] not affect the substantial rights of the parties" (second alteration in original) (internal quotation marks and citation omitted)), *overruled in part on other grounds by Tollardo*, 2012-NMSC-008, ¶ 37. Because Defendant objected to admission of Exhibit 86 at trial, we will apply a harmless error level of review in determining whether Defendant was prejudiced. *See State v. Astorga*, 2015-NMSC-007, ¶ 42, 373 P.3d 1245 ("When an error is preserved, we review for harmless error."); Rule 12-321(A) NMRA (addressing preservation of arguments for appeal). Under a harmless error review of a nonconstitutional error, we will reverse and remand for a new trial unless the State shows there is no reasonable probability that the error affected the jury's verdict. *Tollardo*, 2012-NMSC-008, ¶ 36. In making this determination, we will consider the circumstances surrounding the error, including "the source of the error, the emphasis placed on the error, evidence of the defendant's guilt apart from the error, the importance of the erroneously admitted evidence to the prosecution's case, and whether the erroneously admitted evidence was merely cumulative." *Fernandez*, 2023-NMSC-005, ¶ 24 (internal quotation marks and citation omitted). These factors "are not exclusive" but "are merely a guide to facilitate the ultimate determination—whether there is a reasonable probability that the error contributed to the verdict." *Id.* (internal quotation marks and citation omitted).

**{37}** Defendant argues that he was prejudiced by the State's use of the Southside banner. He compares the circumstances of his trial to those in *State v. Torrez*, 2009-NMSC-029, 146 N.M. 331, 210 P.3d 228. In *Torrez*, we found that the district court's admission of testimony from an expert police witness about the defendant's participation in gang activity amounted to reversible error. *Id.* ¶¶ 28-33. However, *Torrez* is distinguishable from the present circumstances. The witness's testimony about gang activity in *Torrez* was extensive, went to "the primary issue before the jury," and "was the linchpin in the [s]tate's evidence rebutting [the d]efendant's claim of self-defense." *Id.* ¶ 33. In contrast, the comments and evidence about Defendant's previous desire for a gang affiliation were brief and not emphasized at trial. Further, the State introduced

circumstantial and direct evidence linking Defendant to the shooting apart from any "wannabe" gang affiliation.

**{38}** We also assess that Defendant significantly contributed to the insertion of the error at trial. The district court admitted Exhibit 86 for its value in authenticating other evidence. Consistent with this ruling, the State did not refer to the exhibit or Defendant's desire for gang affiliation in opening arguments. And the State's witnesses did not testify that the Southside banner suggested that Defendant was affiliated with a gang. Defendant instead identified Southside as a potential gang affiliation during his direct testimony. The State's comments in closing arguments were primarily based on Defendant's own testimony. Accordingly, we conclude there is no reasonable probability that the erroneous use of Exhibits 86 and 97 affected the jury's verdict. *Barr*, 2009-NMSC-024, ¶ 54. The error was harmless.

**b.    Photographs of Defendant with guns show identity and opportunity**

**{39}** Defendant next claims the district court abused its discretion in admitting two photographs posted on his Facebook profile, Exhibits 87 and 88. Exhibit 87 depicts Defendant sitting on a washing machine or clothes dryer, facing the camera. He is dressed in black clothing and is holding a firearm. Exhibit 88 shows a close-up of Defendant's face, which is partially overlaid by the muzzle of a gun. It is unclear whether the gun is real or a clip-art image from a social media filter. The following words are written along the bottom: "It's about who catch the other slipping, it ain't about choppers and rugers." Defendant testified that the words in Exhibit 88 are lyrics from a rap song by "Boosie."

**{40}** The State filed a notice of intent to introduce Exhibits 87 and 88 prior to trial. In this notice, the State proffered that Exhibit 87, the picture of Defendant sitting on the washing machine holding a gun, was relevant to show Defendant's appearance as consistent with the shooter. The State proffered that Exhibit 88, the picture of Defendant with a muzzle and rap lyrics, was relevant to show Defendant's motive to "catch the other slipping," opportunity, plan, and lack of mistake. At a pretrial hearing, the district court concluded that both photographs were relevant because of the color of Defendant's clothing, the firearms, and "perhaps state of mind."

**{41}** The State introduced Exhibits 87 and 88 during the testimony of Detective Basile, who testified that the two photographs were of interest to his investigation because of the dark color of Defendant's clothing and the firearms. During closing arguments, the State also referred to Exhibit 88 as relevant to Defendant's motive, stating that Defendant and Angelita "had been on and off again in the past, but this time the defendant was going to 'catch them slippin',' just like we saw in that slide, that photo that he said was from a song."

**{42}** Defendant argues that these photographs are irrelevant due to the remoteness of time between the shooting and when the photographs were taken, unfairly prejudicial due to their content, and used only to suggest that Defendant was a gang member and had a propensity to commit the shooting. Similar to its arguments about the images of

firearms in Exhibit 5, the State argues that these two exhibits were "probative of Defendant's interest in and familiarity with firearms and such probative value was not substantially outweighed by any unfair prejudice to Defendant." Again, pursuant to Rule 11-404, Exhibits 87 and 88 were not admissible to show propensity but could be admitted for a purpose other than showing propensity, such as to show motive, identity, or opportunity. Rule 11-404(B)(1)-(2).

{43}    Although the State does not argue that Exhibits 87 and 88 were relevant to motive or intent in this appeal, we note the State used the rap lyrics in Exhibit 88 to argue Defendant's motive to "catch them slippin'." We conclude that the exhibit was not relevant to motive under the circumstances presented. "Motive is specific; it is generally based on evidence that the defendant himself had a history of conflict with the victim." *State v. Chavez*, 2024-NMSC-023, ¶ 30, 562 P.3d 521 (internal quotation marks and citation omitted). Thus, in *Chavez*, we held that an unredacted recording of a jail phone call in which the defendant advised his son to stab "'anybody' and 'everybody'" could not be admitted to prove the defendant's motive for stabbing and murdering the victim. *Id.* ¶¶ 6, 29-30. The defendant's statements to his son were made after the fatal incident and failed to express any motive with respect to the victim but instead "displayed animus toward . . . humanity at large." *Id.* ¶ 30. Similarly, the rap lyrics in Exhibit 88 do not evince any specific animus towards Victim, Angelita, or any of the other three teenagers visiting Angelita's home. Rather, the State asserted in closing argument that Defendant had a general desire "to catch them slippin'." Such "broad generalizations" of hostility are not relevant to motive under Rule 11-404(B)(2). *See Chavez*, 2024-NMSC-023, ¶ 30. ("We are not prepared to conclude that evidence of general misanthropy is evidence of motive in a specific case.").

{44}    However, like our analysis of the firearm images in Exhibit 5, we conclude Exhibits 87 and 88 were relevant to establishing Defendant's identity as the masked shooter and opportunity to commit the shooting. Rule 11-404(B)(2). The evidence at trial suggested the masked shooter was dressed in black and carrying a gun. Defendant also claimed that he did not have access to a firearm at the time. The photographs showing Defendant dressed in black clothing and holding a firearm (Exhibit 87) or pointing a gun at the camera (Exhibit 88) are relevant to establish Defendant's appearance as consistent with the masked shooter and his ability to commit the charged crimes. "[T]he law does not ban admission of potential propensity evidence that also goes to proving something other than Defendant's propensity to act in a certain way." *Bailey*, 2017-NMSC-001, ¶ 19.

{45}    Our conclusion that the exhibits were relevant for purposes of proving identity and opportunity does not end the inquiry, however. The photographs should have been excluded if their probative value was substantially outweighed by the danger of unfair prejudice. Rule 11-403. While relevant, the two photographs offered only weak circumstantial evidence of Defendant's identity as the masked shooter and opportunity to commit the charged crimes. The State provided no evidence that Defendant used either of the firearms depicted in Exhibits 87 or 88 to commit the shooting. *See Jones*, 2025-NMSC-049, ¶ 52 (noting the prejudice arising from evidence of unrelated firearms). And there is nothing particularly striking or unique about the black clothing in

Exhibit 87 to identify Defendant as the shooter. Exhibit 88 carries even less probative value, as it is unclear whether the muzzle pointed at the camera is a social media filter or a real gun. And the words in Exhibit 88 express a general hostility towards others that could be seen as a potential propensity to commit the crimes.

**{46}** Yet the words in Exhibit 88 are also poetic and abstract, which lessens their prejudicial impact. The two photographs were also posted on Defendant's public Facebook profile, and neither of the photographs are especially provocative or inflammatory. Defendant suggests the photographs depict him engaging in illegal activity because he was underage when they were taken, and thus they document him being a minor in possession of a firearm, in contravention to NMSA 1978, § 30-7-2.2(C)(1) (2022). But Defendant had no prior criminal history, and no one suggested to the jury that Defendant's mere possession of a firearm was illegal. We therefore see factors which mitigate the potential prejudice arising from these exhibits, tilting the balance in favor of admissibility under Rule 11-403.

**{47}** "The determination of unfair prejudice is fact sensitive, and, accordingly, much leeway is given trial judges who must fairly weigh probative value against probable dangers." *Bailey*, 2017-NMSC-001, ¶ 16 (internal quotation marks and citation omitted). Under this highly deferential standard of review, we cannot say that the district court abused its discretion in determining that the probative value of Exhibits 87 and 88 was not substantially outweighed by the danger of unfair prejudice. As the district court's decision to admit the photographs is neither "clearly untenable" nor "[un]justified by reason," *Samora*, 2016-NMSC-031, ¶ 37, the court did not err in admitting the exhibits.

### 3. Photograph taken around time of Defendant's arrest

**{48}** Defendant also objects to the admission of State's Exhibit 73, which is a photograph of Defendant that was taken when he was arrested about a week after the shooting. The photograph depicts Defendant in a white t-shirt, sitting in the open door of an unmarked vehicle, with his face and body turned towards the camera. Both of his arms are pulled behind his back so that only his shoulders, abdomen, and hips are visible. He has a lit cigarette hanging loosely out of his mouth.

**{49}** At trial, Defendant argued that Exhibit 73 was irrelevant and unfairly prejudicial. The State proffered this photograph was relevant to show Defendant's appearance around the time of the shooting, as the testimony suggested that the shooter was larger in size and Defendant had lost approximately 100 pounds before trial. The district court admitted the photograph, explaining that Defendant's weight and height at the time of the shooting had "become a significant issue" in the case and the photo made Defendant's appearance at the time of the shooting more probable. The district court also refused to "speculate on what other photos there may have been" to establish this fact and concluded that the probative value was not substantially outweighed by the danger of unfair prejudice. The State showed Exhibit 73 to Detective Basile and a crime scene technician, both of whom confirmed that the image depicted Defendant, and Detective Basile confirmed that Defendant had lost weight since July 2022.

**{50}**     Defendant argues that any probative value of Exhibit 73 was substantially outweighed by the risk of unfair prejudice, as the photo shows him sitting instead of standing and the district court did not consider other ways of proving Defendant's appearance around the time of the shooting. Defendant cites *State v. Haynes*, 2000-NMCA-060, ¶ 20, 129 N.M. 304, 6 P.3d 1026, in support of his assertion that the district court abused its discretion. In *Haynes*, the Court of Appeals determined that the introduction of a "mugshot" or booking photo of the defendant was unfairly prejudicial and amounted to reversible error. *Id.* ¶¶ 13-22; *see also State v. Gutierrez*, 1979-NMCA-016, ¶¶ 11-24, 93 N.M. 232, 599 P.2d 385 (condemning the use of booking photographs to indirectly introduce the defendant's prior criminal history but determining that the state's references to the defendant's prior criminal history were harmless under the circumstances). However, *Haynes* is distinguishable from the facts presented. The photo in *Haynes* was a traditional mugshot of the defendant, added little probative value to the issues presented in that case, and was from a prior unrelated arrest, thus indirectly revealing to the jury that the defendant had a prior criminal history. *Haynes*, 2000-NMCA-060, ¶¶ 13-14. In contrast, Exhibit 73 is not a traditional mugshot, is relevant to establishing the identity of the masked shooter because it shows Defendant's appearance around the time of the incident, and was taken during Defendant's arrest for the underlying charges. Exhibit 73 is not analogous to the booking photo determined to be inadmissible by the *Haynes* Court. *See also Rackley*, 2000-NMCA-027, ¶¶ 14-19 (concluding that a mugshot photo of the defendant was relevant to showing identity and was not outweighed by the risk of unfair prejudice under the circumstances of the case).

**{51}**     We concur that the district court should assess the availability of other evidence when balancing probative value against the danger of unfair prejudice. *Haynes*, 2000-NMCA-060, ¶ 20 ("[W]hen balancing the probative value of evidence against its prejudicial effect, the trial court must consider the availability of other ways to prove the matter."). However, Defendant did not point to any other evidence the State could have proffered to show Defendant's appearance around the time of the incident. Under these circumstances, the district court properly determined that it could not balance Exhibit 73 against other potential evidence establishing this fact. Accordingly, we conclude the district court did not abuse its discretion in determining that the probative value of Exhibit 73 was not substantially outweighed by the danger of unfair prejudice under Rule 11-403.

### B.     Challenges to Text Messages from Defendant's iPhone

**{52}**     Defendant next challenges the admission of State's Exhibit 96. Exhibit 96 is a report of text messages extracted from the iPhone which was registered to Defendant and recovered near the crime scene. The twenty-eight-page report lists hundreds of incoming and outgoing messages on the iPhone from the day and hours prior to the shooting, along with associated metadata. A few of the messages appear to have been authored by Angelita, as the texts discuss Angelita's and Marissa's plans to meet. However, most of the messages appear to be conversations between Defendant and his friends and family members.

**{53}** For example, several incoming messages refer to the device's user as "bro" or "brother." Several of the other messages discuss Defendant's plans to move to Arizona with his cousin Rudy in September without bringing or telling Angelita. Some of the texts reference guns, drugs, and the device's owner picking up individuals or driving. The last text messages in the report were sent on July 24, 2022, at 2:02 a.m., less than an hour before the shooting. The last outgoing message is to an unidentified contact and reads, "Brother I need you." "Ay brother" is the incoming response. Defendant asserted that he was not in control of the phone when these last two messages were exchanged.

**{54}** At trial, Defendant objected to admission of Exhibit 96 on relevancy, unfair prejudice, hearsay, and confrontation grounds. However, when the district court asked Defendant to specify which of the messages he objected to in Exhibit 96, Defendant only identified a single incoming message received from a contact identified as "Rudy." The district court overruled Defendant's objections and admitted Exhibit 96.

**{55}** On appeal, Defendant argues that Exhibit 96 was irrelevant and unfairly prejudicial character evidence, the messages were hearsay, and admission of the report violated his confrontation rights. We consider Defendant's challenges to the relevance of Exhibit 96 before discussing his objections on hearsay and confrontation grounds.

1. **The text messages showed Defendant's identity as the shooter**

**{56}** Defendant claims the district court abused its discretion in admitting Exhibit 96 because many of the messages were irrelevant, unfairly prejudicial, and only used to show his propensity to commit the charged crimes. Defendant particularly challenges messages which refer to a third-party's criminal conduct. For example, a few of the incoming texts refer to a third-party who is "on the brac[elet]" and cannot "leave his house after 6." Defendant suggests that these messages refer to a third-party who was in community confinement and asserts that the risk that the jury would convict him based on his association with this third-party outweighed any probative value of these messages. Similarly, in another incoming message, one of Defendant's contacts texts, "ima try to go by drop these oxys off & we'll chill for a bit," while in yet another message a contact texts, "Get me a Leno plz." Defendant suggests that the slang in these texts refers to the sale or purchase of illegal drugs.

**{57}** Generally, evidence of a third-party's wrongdoing is inadmissible to show the defendant's propensity to commit crimes. *State v. Phillips*, 2000-NMCA-028, ¶ 26, 128 N.M. 777, 999 P.2d 421. However, this evidence may be admitted when there is "a direct link between the third-party evidence and the particular charge against the accused, that demonstrates more than just guilt by association." *Id.* We discern a link between the third-party evidence in Exhibit 96 and the charged criminal conduct at issue here. The State argues that Exhibit 96 was relevant to show Defendant's ownership and control over the iPhone found near the crime scene. We agree the incoming and outgoing messages from the day prior to the shooting were relevant for that purpose. Although the messages in Exhibit 96 suggested that Defendant's associates may have participated in criminal activity, these messages provided relevant context for the jury to assess Defendant's claim that he and Angelita shared the phone and that she had the

phone at the time of the shooting. As the iPhone was one of the few items of physical evidence connecting Defendant to the crime scene, Exhibit 96 thus was admitted to establish Defendant's identity as the shooter. Rule 11-404(B)(2).

**{58}** We also agree with the district court that the probative value of Exhibit 96 was not substantially outweighed by the risk of unfair prejudice. Rule 11-403. The references to drugs or ankle monitors in Exhibit 96 are obscured by slang and occur in only a few messages in the lengthy report. As Defendant concedes, the messages referencing drugs or third-party misconduct were not emphasized at trial. The district court did not abuse its discretion in determining that these few prejudicial messages did not substantially outweigh Exhibit 96's strong probative value in connecting Defendant to the charged crimes.

**{59}** Defendant also suggests the district court erred by failing to redact the messages referring to drugs or third-party misconduct. However, it appears that Defendant only asked the district court to redact the one message by Rudy, even though it appears the parties extensively discussed admission of the text messages prior to trial. Defendant thus would need to show plain error arising from the messages which he now suggests should have been redacted. *See State v. Lucero*, 1993-NMSC-064, ¶¶ 12-13, 116 N.M. 450, 863 P.2d 1071 ("Even if the defendant did not raise proper objections at trial, [the defendant] may be entitled to relief if the errors . . . constituted plain error." (internal quotation marks and citation omitted)); Rule 12-321(B)(2)(b) (permitting review of plain error on appeal notwithstanding failure to preserve the issue); Rule 11-103(A)(1)(b), (E) NMRA (requiring a party to state specific grounds for error in admitting evidence and noting that the "court may take notice of a plain error" even if not preserved). "For a determination of plain error, we . . . require that admission of the evidence constituted an injustice that created grave doubts concerning the validity of the verdict." *Chavez*, 2024-NMSC-023, ¶ 11 (brackets, internal quotation marks, and citation omitted). We will "consider the error's effect on the overall fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks and citation omitted). None of the messages Defendant challenges create grave doubts about the jury's verdict. The district court did not commit plain error in failing to redact parts of Exhibit 96.

## 2. Rudy's text message was nontestimonial and nonhearsay

**{60}** Defendant also challenges the admission of Exhibit 96 under the Confrontation Clause of the Sixth Amendment to the United States Constitution and on hearsay grounds. However, Defendant only preserved this challenge to one incoming message from the hundreds of messages in the report. *See* Rule 12-321(A) ("To preserve an issue for review, it must appear that a ruling or decision by the trial court was fairly invoked."). This message is from Rudy at 11:20 a.m. the day prior to the shooting. The message reads, "I was going to ask if u could give me a ride to get my guns but I have to wait until Thursday I had to let bobby use my 38 because some weirdo went looking for him last night." When asked about Rudy's message at trial, Detective Basile testified that he was interested in the message because it mentions a "38" and the firearms lab report suggested that the shooter may have used a .38 caliber special revolver. During

closing arguments, the State indirectly referred to this message by stating, "Remember there're messages with Rudy; Rudy's saying, hey, I need to go get a [gun]."

**{61}** On appeal, Defendant argues that admission of Rudy's message constitutes reversible error and that admission of the remaining messages in Exhibit 96 constitutes plain error. However, Defendant only presents a sufficient appellate argument on the one incoming message from Rudy. We will not address a question raised on appeal when the appellant "makes no argument and provides no facts in the briefing to help us answer that question." *State ex rel. Off. of the State Eng'r v. Romero*, 2022-NMSC-022, ¶ 2 n.1, 521 P.3d 56. We therefore consider only whether the district court committed reversible error in admitting Rudy's text message. We decline to review the remaining messages in Exhibit 96 on hearsay and confrontation grounds.

**{62}** And we reject Defendant's challenge to Rudy's text under the Confrontation Clause. Rudy's out-of-court statement was not made for the primary purposes of creating a substitute for trial testimony. Because the text is not testimonial, the right to confrontation does not apply. *See State v. Tsosie*, 2022-NMSC-017, ¶¶ 24-42, 516 P.3d 1116 (explaining that the confrontation clause applies to testimonial statements by nontestifying witnesses).

**{63}** We also conclude that Rudy's message does not constitute inadmissible hearsay. Generally, hearsay is inadmissible except as otherwise provided by rule or statute. Rule 11-802 NMRA. Hearsay is an out-of-trial statement which a party offers to prove the truth of the matter asserted. Rule 11-801(C) NMRA. A *statement* is "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Rule 11-801(A). However, "Statements offered for a purpose other than their truth are not hearsay." *Otto*, 2007-NMSC-012, ¶ 18.

**{64}** Rudy's text message was not admitted for the truth of its assertions. The State did not seek to prove that Rudy had a .38 caliber weapon that he lent to a person named "bobby." As previously noted, the State primarily used Exhibit 96 as evidence that Defendant had possession of the iPhone in the hours prior to the shooting. The message is not hearsay to the extent it was used to show Defendant's control over the iPhone at the time of the incident.

**{65}** In this regard, we view the circumstances presented as analogous to those in *Jim v. Budd*, 1987-NMCA-079, 107 N.M. 489, 760 P.2d 782. In *Jim*, a decedent in a wrongful death action directed the defendant to "'let the gates down against the chain,'" when interacting with an injury-causing mechanism. *Id.* ¶¶ 6, 13. The Court of Appeals found that the assertion was not offered for truth but instead was offered to show that the decedent was "in control of the procedure and that he knew what he was doing." *Id.* ¶ 11. Similarly, Rudy's message was not offered for its truth but to show that Defendant was the primary user of the iPhone and thus make it more probable that Defendant, and not Angelita, dropped the phone in the alley near the crime scene. "[I]f an out-of-court statement is offered in evidence merely for the purpose of establishing what was said at the time, and not for the truth of the matter, the testimony is not hearsay." *State v.*

*Reyes*, 2002-NMSC-024, ¶ 29, 132 N.M. 576, 52 P.3d 948, *abrogated on other grounds by Allen v. LeMaster*, 2012-NMSC-001, ¶ 36, 267 P.3d 806.

**{66}** Rudy's message also was not hearsay to the extent it was used to rebut Defendant's testimony that he could not drive the Ford F-150 found at the scene or that he did not have access to a firearm at the time of the shooting. In *State v. Jackson*, 2018-NMCA-066, ¶ 21, 429 P.3d 674, the Court of Appeals determined that text messages from the defendant's potential clients discussing the price of sexual services were not hearsay. The texts were not used to establish the truth of the asserted prices or the location of the sex worker but were instead admitted to prove that the defendant was "motivated by money to set up commercial sexual transactions." *Id.* ¶ 21. Similarly, in *State v. Saiz*, 2017-NMCA-072, ¶¶ 31-36, 404 P.3d 422, the Court of Appeals concluded that a voice text from the defendant's cousin stating "'You better not be f[]ing me over, prim'" was not hearsay. The voice text was not admitted for its truth but instead was "an implied expression of skepticism about [the d]efendant's intentions or actions" or "an implied warning or threat of an undefined consequence." *Id.* ¶ 35.

**{67}** The messages in *Jackson* and *Saiz* are analogous to Rudy's text message here. Rudy's text asserts that he lent a firearm to a third-party and asks Defendant to give him a ride to pick up the weapon. The jury did not need to find either of these assertions to be true in reaching a verdict in this matter. Rather, the text is relevant only for what it implies, as Rudy's request for a ride implies Defendant's ability to drive and Rudy's reference to a "38" implies that he could have been a potential source for the gun used in the shooting. Under our Rules of Evidence, "implied assertions are not hearsay." *Jim*, 1987-NMCA-079, ¶ 12; *accord State v. Toney*, 2002-NMSC-003, ¶ 3, 131 N.M. 558, 40 P.3d 1002 (citing *Jim* with approval and determining a direction to leave a victim by the river was not hearsay). Accordingly, the district court did not abuse its discretion in admitting Rudy's text message over Defendant's hearsay objection.

## C.  Officer Pacheco's Testimony Is Admissible as a Lay Opinion

**{68}** Finally, Defendant claims the district court improperly allowed Officer Pacheco to invade the province of the jury by expressing opinions about several street camera videos showing the green Ford F-150 driving around Angelita's neighborhood shortly before the shooting. Officer Pacheco testified that he reviewed the street camera videos after noting the green Ford F-150 at the crime scene. Based on distinct characteristics of the Ford F-150, Officer Pacheco opined that the truck depicted in the videos was the same truck found at the scene. Officer Pacheco further testified that, based on certain shadows, reflections, and other details he saw in the videos, he believed the driver of the Ford F-150 was male and wearing dark clothing. He also suggested another individual was sitting in the passenger seat and was smoking or vaping. Defendant did not object to Officer Pacheco's opinion testimony at trial. We therefore review this issue for plain error. *Lucero*, 1993-NMSC-064, ¶¶ 12-13.

**{69}** Defendant claims Officer Pacheco's testimony contradicts the "silent witness" rule regarding photographic or video evidence. However, the "silent witness" rule primarily addresses the authentication of photographic or video evidence, recognizing

that this "evidence is a 'silent witness' which speaks for itself and is substantive evidence of what it portrays independent of a sponsoring witness." *State v. Henderson*, 1983-NMCA-094, ¶ 8, 100 N.M. 260, 669 P.2d 736; *accord State v. Imperial*, 2017-NMCA-040, ¶¶ 29-30, 392 P.3d 658. Officer Pacheco's opinion testimony about the street camera videos is instead governed by Rule 11-701 NMRA, which addresses the admissibility of lay opinion testimony.

**{70}** Under Rule 11-701, a lay witness's "testimony in the form of an opinion is limited to one . . . rationally based on the witness's perception, [and] helpful to clearly understanding the witness's testimony or to determining a fact in issue." In *State v. Sweat*, 2017-NMCA-069, 404 P.3d 20, the Court of Appeals explained that a lay witness's testimony identifying a defendant depicted in a photograph or video can be helpful for determining a fact in issue "where there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph [or video] than is the jury." *Id.* ¶ 22 (internal quotation marks omitted) (quoting *People v. Thompson*, 2016 IL 118667, ¶ 41, 49 N.E.3d 393). The *Sweat* Court adopted five factors to consider when determining the helpfulness of the testimony, including, as relevant to our analysis, "the witness's familiarity with the defendant's appearance" and "the degree of clarity of the surveillance recording and the quality and completeness of the subject's depiction in the recording." *Id.* (internal quotation marks omitted) (quoting *Thompson*, 2016 IL 118667, ¶¶ 44, 46-48). "The existence of even one of these factors indicates [that] there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph [or video] than is the jury." *Id.* (first alteration in original) (internal quotation marks omitted) (quoting *Thompson*, 2016 IL 118667, ¶ 49).

**{71}** Officer Pacheco's testimony primarily identified the vehicle found parked outside Angelita's home, instead of Defendant himself. We conclude his identification of the Ford F-150 was helpful to the jury. Officer Pacheco observed the green Ford F-150 parked at the crime scene; thus, he was more familiar with the vehicle's appearance than the jury. Further, the street camera videos were dark and grainy, recorded from a distance, and directed downwards at an awkward angle. Given the poor clarity and quality of the videos, Officer Pacheco was more likely to correctly identify the Ford F-150 in the videos than the jury. *See Sweat*, 2017-NMCA-069, ¶ 24 (concluding poor quality video supported admissibility of opinion testimony identifying the defendant).

**{72}** Officer Pacheco's opinions about the potential number, gender, or other characteristics of the passengers in the vehicle presents a separate question. There is no indication that Officer Pacheco had a special familiarity with the passengers in the Ford F-150. *See State v. Chavez*, 2022-NMCA-007, ¶ 42, 504 P.3d 541 (concluding officer testimony that the defendant was armed after viewing ATM surveillance video was not helpful to the jury because there was no evidence the officer had a "special familiarity with the visual appearance of the handgun"). However, Officer Pacheco's testimony about these potential passengers was still helpful to the jury due to the quality of the videos. In *State v. Gwynne*, 2018-NMCA-033, ¶¶ 3, 7, 28, 33, 417 P.3d 1157, an officer had compared several dark and grainy videos with photographs of the defendant. Based on this comparison, the officer testified that the videos depicted the defendant

due to a distinct scar or tattoo visible in both the videos and the photographs of the defendant. *Id.* ¶¶ 3, 7, 28. The Court of Appeals concluded the officer's testimony identifying the defendant was helpful to the jury and admissible under Rule 11-701 due to the poor clarity of the videos. *Gwynne*, 2018-NMCA-033, ¶ 33.

**{73}**    We conclude the circumstances presented are analogous to those in *Gwynne*. The State presented multiple street camera videos, each of which was dark, grainy, and showed a moving vehicle intermittently illuminated by street lights. The State had to pause the videos at several points to show the jury different still-frames revealing details about the potential occupants of the Ford F-150. Officer Pacheco's testimony was helpful insofar as he pointed out details in the poor-quality videos which the jury could consider in its deliberations about the truck's passengers. We therefore see no plain error arising from the admission of Officer Pacheco's opinions about the passengers in the truck.

## III.    CONCLUSION

**{74}**    The State used a Facebook banner with the word "Southside" to erroneously argue Defendant's propensity to commit the shooting; however, the error was harmless under the circumstances. We see no error arising from the other issues raised in this appeal. We therefore affirm Defendant's convictions for first-degree murder and aggravated assault and remand this matter back to the district court.

**{75}    IT IS SO ORDERED.**

**C. SHANNON BACON, Justice**

**WE CONCUR:**

**JULIE J. VARGAS, Chief Justice**

**MICHAEL E. VIGIL, Justice**

**DAVID K. THOMSON, Justice**

**BRIANA H. ZAMORA, Justice**